## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CHRISTIN PENNELL,

      Plaintiff,

v.                             Case No: 8:19-cv-2433-CEH-TGW

GRADY JUDD,

      Defendant.

_____/

## O R D E R

This cause comes before the Court upon Defendant Grady Judd's Motion for Summary Judgment (Doc. 44), to which Plaintiff Christin Pennell responds in opposition (Doc. 57), and Pennell's Motion for Partial Summary Judgment (Doc. 45), to which Judd responds in opposition (Doc. 55).

Former Deputy Sheriff Christin Pennell asserts that, within approximately a three-year span of time, Sheriff Grady Judd, in his official capacity as Polk County Sheriff, interfered with her rights under the Family and Medical Leave Act, retaliated against her for exercising her rights under the Family and Medical Leave Act, retaliated against her for exercising her rights under Florida's Workers' Compensation Law, discriminated against her on the basis of her sex, discriminated against her on the basis of her disability, and discriminated against her on the basis of her association with her husband's disability.

Pennell seeks summary judgment on her FMLA interference claim. Judd seeks summary judgment on all claims. The Court will deny Pennell's motion and grant-in-part and deny-in-part the Sheriff's motion.

## I.    BACKGROUND

### A. Statement of Facts[1]

Christin Pennell began working for the Polk County Sheriff's office as a clerical assistant in March of 2011. Doc. 66 ¶1. Following her swearing-in on June 24, 2014, she started working as a deputy sheriff. *Id.* at ¶3. She "mostly stayed" in that position until the end of her employment with the Polk County Sheriff's office on March 31, 2021, when she voluntarily resigned on good terms. *Id.* at ¶¶1, 36. She met her husband, Deputy Sheriff Adam Pennell, while working for the Polk County Sheriff's office. *Id.*

> ### i. *Pilot Trainee Program, Tactical Flight Officer Program, and Initial FMLA Requests*

In June of 2015, Pennell applied to the pilot trainee program. *Id.* at ¶4. At that time, she had worked as a law enforcement officer for only one year and was in a probationary period. *Id.* Because prior law enforcement training is highly beneficial to a pilot's success in working with other law-enforcement officers while flying missions, a pilot trainee generally should have prior law enforcement training. *Id.* at ¶5. She was not selected for the position because more qualified candidates existed. *Id.* at ¶7. She

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based upon the parties' Amended Stipulation of Agreed Material Facts (Doc. 66), including employment records referenced therein and depositions and affidavits.

also applied for admission into the tactical flight officer program. *Id.* at ¶8. On January 19, 2016, she was accepted into the program. *Id.*

In August of 2016, Pennell applied for FMLA leave due to "pelvic issues," but her FMLA application was denied because she was ineligible, as she had not worked 1,250 hours within a 12-month period. *Id.* at ¶9. After she met this hourly requirement, she applied for FMLA leave again in September of 2016. *Id.* at ¶10. Her application was approved. *Id.* Prior to the approval, she completed a "Leave of Absence Without Pay Request" on September 30, 2016, for seven dates that she missed work. *Id.* Chief-of-Staff Steve Lester approved that request on October 13, 2016. *Id.*

## ii. *Adam's Injury, Pennell's Return to Work, and FMLA Leave*

On October 29, 2016, Adam Pennell suffered critical injuries when a truck hit him while he responded to a call. *Id.* at ¶11. Intubated, in a coma, and fighting for his life, Adam underwent surgeries. *Id.* Within days of the accident, Benefits Supervisor Melissa Calandros and Benefits Coordinator Heather Strafford visited Adam's hospital room to speak with Pennell about FMLA leave. *Id.* at ¶12. Adam "had a serious health condition"; both Calandros and Strafford understood that Adam would be in inpatient care for some time. *Id.* at ¶13. Pennell did not receive FMLA leave during the time when Adam was hospitalized. *Id.* at ¶14. The Polk County Sheriff's office placed Pennell on an unpaid leave of absence. *Id.* at ¶15. On December 19, 2016, Captain Theresa Garcia sent a text message to Pennell, reminding Pennell that she should be eligible for FMLA leave since she was now Adam's caretaker. *Id.* at ¶16.

On January 8, 2017, Workers' Compensation Case Manager Dan Boreland drafted a letter to Adam's physician. *Id.* at ¶17. The letter indicated that Adam did not require a home health aide. *Id.* Later, the letter was sent to the Sheriff. *Id.* On January 9, 2017, after she received an e-mail from Heather Strafford, Pennell sent an FMLA application to the Sheriff and indicated that she would take the verification to Adam's doctor once she received it. *Id.* at ¶18. The next day, Pennell received the verification from the Sheriff and delivered the verification to Adam's physician at the Watson Clinic. *Id.*

On January 12, 2017, Pennell sent an e-mail to Calandros and Human Resources Director Lance Fulse, which recapped their January 5, 2017 conversation, when they discussed Pennell's return to work and advised Pennell that they would send documents to Pennell for Adam's physicians to complete. *Id.* at ¶19. On the same day, Pennell notified Strafford that she had delivered the FMLA verification to Adam's doctor and that the clinic had indicated that the FMLA paperwork would be ready by January 20, 2017. *Id.* at ¶20. She also questioned why her application was already denied. *Id.*

Returning to work on January 16, 2017, Pennell worked on January 16, 17, 20, 21, and 22. *Id.* at ¶21. On January 23, 2017, Boreland submitted a letter from Dr. Kazmier to the Sheriff, which stated that Adam required a home health aide because he could not dress himself or drive until January 23, 2017. *Id.* at ¶22. On January 24, 2017, Strafford advised Pennell that her application for FMLA leave had been preapproved. *Id.* On January 26, 2017, the Sheriff fully approved her application for

FMLA leave to care for her husband from December 12, 2016, through January 23, 2017. *Id.* at ¶24. Thus, Pennell was retroactively approved for FMLA leave from December 12, 2016, to January 23, 2017. *Id.* at ¶25.

> iii. *Performance Evaluation and Second Application to Pilot Trainee Program*

On July 17, 2017, Garcia provided Pennell with her annual performance evaluation. *Id.* at ¶27. Pennell's rating cycle for the application time period extended from June 24, 2016, through June 23, 2017. *Id.* at ¶26. During this cycle, Pennell was out on several different types of leave: FMLA, workers' compensation, and leave of absence without pay ("LWOP"). *Id.* Her performance evaluation indicated that she used 330 hours of FMLA and 129 hours of "sick/unscheduled" paid time off. *Id.* at ¶27. Leave is considered "unscheduled" when it is taken less than 12 hours before an officer's shift. *Id.* at ¶32. Under the Sheriff's General Orders, a deputy sheriff is ineligible for a fixed step pay increase if the deputy had more than 96 unscheduled hours during his or her annual rating cycle. *Id.* at ¶31. Indeed, the General Orders provide:

> Effective for all performance evaluations, absences utilizing unscheduled paid time off and/or a leave of absence without pay in excess of the allotted 96 hours of unscheduled absences per year (excluding FMLA leave) shall be considered excessive and result in the loss of a step pay increase merited in that fiscal year.

*Id.* at ¶40 (internal quotation marks omitted) (original emphasis removed).

Upset that she did not receive a pay raise, Pennell walked out of the performance evaluation meeting and considered resigning. *Id.* at ¶28. However, she

returned and apologized. *Id.* Garcia offered to facilitate a meeting between Pennell and the Human Resources department. *Id.*

According to Payroll Supervisor Lisa Wojdyla, during Pennell's performance review period (from June 24, 2016 to June 23, 2017), Pennell had 1,291.50 unscheduled hours, 1,186 of which were "protected" and not used against Pennell in determining whether she was eligible for the step raise. *Id.* at ¶29; Doc. 44-4 at ¶3. In contrast to the performance evaluation, Wojdyla's calculations show that Pennell had 105.5 unscheduled hours, rather than 129 hours. Doc. 66 at ¶29. Wojdyla attributed it to a "simple mistake" by the Sheriff's payroll department at the time. *Id.* According to Wojdyla, the Sheriff previously maintained a policy "in which an employee was required to use a bank of holiday PTO hours that may not have been accrued until sometime in the future." *Id.* at ¶30 (internal quotation marks omitted). As such, Pennell "used several hours of holiday PTO that ran concurrent with her unpaid leave and resulted in her having a negative forty hours of holiday pay upon her return to work. *Id.* (internal quotation marks omitted).

On July 18, 2017, Pennell sent a text message to Garcia, which contained a photograph of the November 30, 2016 doctor's note that addressed the length of time for which Mr. Pennell would need care. *Id.* at ¶33.

On June 11, 2018, Pennell applied again to the pilot trainee program. *Id.* at ¶34. She testified that she was not critical about anything that occurred during the interview process during her second application for the pilot training position. *Id.* She "had no issues" with the candidate who was selected for the position, Deputy Reveron. *Id.* at

¶34. When Reveron was unsuccessful in this position, Dustin Johnson was selected to replace him. *Id.* at ¶35.

### iv.   *Pennell's Disability and Workers' Compensation Claims*

Pennell claims that she has a disability related to ongoing, personal female issues. *Id.* at ¶38. Although she underwent surgery in October of 2014, she considers this condition a permanent disability because she has flare-ups that affect her day-to-day activities. *Id.* She recalls that Sergeant Strickland delayed an opportunity for her to leave by one hour. *Id.* She also claims that she has a disability related to hypertension, for which she has received medication since April or May of 2018. *Id.* at ¶39.

Finally, Pennell filed the following workers' compensation claims during her career with the Polk County Sheriff's office:

- May 30, 2014 – Pennell filed a workers' compensation claim for a heat injury from participating in firearm qualifications and went to the hospital. *Id.* at ¶37. She testified that this claim is not the subject of this lawsuit. *Id.*

- June 17, 2014 – Pennell filed a workers' compensation claim for feeling nauseated while driving. *Id.* She testified that this claim is not the subject of this lawsuit. *Id.*

- August 27, 2014 – Pennell filed a workers' compensation claim for having an allergic reaction to a cat while searching for a suspect. *Id.* She testified that this claim is not the subject of this lawsuit. *Id.*

- December 5, 2014 – Pennell filed a workers' compensation claim after injuring her knee while chasing a suspect. *Id.* She testified that this claim is not the subject of this lawsuit. *Id.*

- September 5, 2015 – Pennell filed a workers' compensation claim after again injuring her knee. *Id.* She testified that this claim is not the subject of this lawsuit. *Id.*

- March 25, 2016 – Pennell filed a workers' compensation claim after being involved in a single car crash as the at-fault driver while driving her patrol car. *Id.* She testified that this claim is not the subject of this lawsuit. *Id.*

- August 2016 – Pennell filed a workers' compensation claim after she felt dizzy, light-headed, vomited, and had body aches while driving a department vehicle. *Id.* She testified that this claim is not the subject of this lawsuit. *Id.*

- February 19, 2017 – Pennell filed a workers' compensation claim after stepping in a hole and injuring her knee. *Id.*

- August 29, 2017 – Pennell filed a workers' compensation claim after she stepped in spilled gas while refueling her patrol car at the Polk County Sheriff's office fueling station. *Id.* This claim was denied. *Id.*

- December 8, 2017 – Pennell filed a workers' compensation claim when a narcotics test kit exploded in her face, injuring her eye. *Id.* On December 22,

2017, Pennell sent a picture of a doctor's note to Garcia via text message, which indicated that she could return to work on December 25, 2017. *Id.*

- October 2018 – Pennell filed a workers' compensation claim after getting into a significant fight with a suspect and suffering a serious injury. *Id.* Shortly after returning to work, Pennell was transferred to a specialty unit— General Crimes Unit—as part of the Crime Suppression Team. *Id.*

### B. Pennell's Claims

Pennell sues Grady Judd in his official capacity as Polk County Sheriff. In the Amended Complaint, Pennell brings the following claims: (1) interference under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; (2) retaliation under the FMLA; (3) "Retaliation/Coercion" under Florida's Workers' Compensation Law, Florida Statutes § 440.01 *et seq.*; (4) sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (5) sex discrimination in violation of the Florida Civil Rights Act, Florida Statutes § 760.01 *et seq.*; (6) discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.*; (7) "Disability/Handicap Discrimination" in violation of the Florida Civil Rights Act; and (8) "Associational Discrimination" in violation of the ADA. Doc. 17 ¶¶40–100. Pennell moves for summary judgment on her FMLA interference claim (Doc. 44),

which the Sheriff opposes (Doc. 55). The Sheriff moves for summary judgment on all claims (Doc. 45), which Pennell opposes (Doc. 57).[2]

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the

---

[2] Both parties failed to file replies to the responses in opposition, even though the Case Management and Scheduling Order and the Local Rules afford them leave to do so. Doc. 14 at 6; Local R. M.D. Fla. 3.01(d).

court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).[3] Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however,

---

[3] Unpublished decisions of the Eleventh Circuit are not binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2.

be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III.    DISCUSSION

The Court begins with Pennell's motion before turning to the Sheriff's motion.

### A. Pennell's Motion for Partial Summary Judgment

Pennell moves for partial summary judgment as to liability only on her FMLA interference claim. Doc. 45 at 1. Pennell alleges that the Sheriff's actions interfered with her lawful exercise of her FMLA rights because the Sheriff denied her the right to utilize FMLA: (1) for her own serious health condition; and (2) to care for her husband, Adam, who had a serious health condition. Doc. 17 ¶45. In seeking summary judgment, Pennell generally argues (1) she was entitled to FMLA benefits; (2) the Sheriff denied her the benefits to which she was entitled; and (3) the denial of FMLA benefits harmed her. Doc. 45 at 15–23.

Although Pennell bases her FMLA interference claim upon her right to use the FMLA for her own serious health condition and her right to use the FMLA to care for Adam, who had a serious health condition, she focuses only upon the latter. Indeed, as the Sheriff highlights in his response, Doc. 55 at 2 n.1, Pennell testified that this action has "nothing to do with" her personal leave that she took before Adam's accident, including her FMLA applications in March of 2016 and September 2016, Doc. 44-13 at 114:5–25.  As such, this claim centers on Pennell's right to use the FMLA to care for Adam. To the extent that Pennell seeks summary judgment on her

12

FMLA interference claim for the Sheriff's interference with her right to use the FMLA for her own serious health condition, the Court will deny her motion.

Among other purposes, Congress enacted the Family and Medical Leave Act "to entitle employees to take reasonable leave . . . for the care of a . . . spouse . . . who has a serious health condition." 29 U.S.C. § 2601(b)(2). To that end, the FMLA provides eligible employees with the right to a total of 12 workweeks of leave during any 12-month period "in order to care for the spouse" of an employee if that spouse "has a serious health condition." *Id.* § 2612(a)(1)(C). The FMLA generally entitles any eligible employee who takes such leave, on return therefrom, "to be restored by the employer to the position of employment held by the employee when the leave commenced"; or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1).

"It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. *Id.* § 2615(a)(1). "An [FMLA] interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied that benefit." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). To succeed on such a claim, the employee need only demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit that was denied. *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018). In an FMLA interference claim, the employee asserts that her employer denied "*or otherwise interfered* with [her] substantive rights under" the FMLA. *White*, 789 F.3d at 1191 (emphasis and alterations in original)

13

(internal quotation marks omitted). The Department of Labor has clarified that interfering with the exercise of an employee's rights "include[s], for example, not only refusing to authorize FMLA leave, but discouraging any employee from using such leave." 29 C.F.R. § 825.220(b); *see Corbin v. Med. Ctr., Navicent Health*, No. 5:15-cv-153(CAR), 2017 WL 1241430, at \*2 (M.D. Ga. Mar. 31, 2017) (explaining that the FMLA does not define "interference," but the regulations provide that "interference" includes discouraging an employee from using leave). The employer's motives are irrelevant to an interference claim. *Batson*, 897 F.3d at 1331.

Additionally, a plaintiff seeking to prove FMLA interference must demonstrate that the violation prejudiced her in some way. *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014). Thus, "a technical FMLA violation is not enough." *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1241 (11th Cir. 2021). To prove that an FMLA violation prejudiced her, a plaintiff "need only demonstrate some harm remediable by either damages or equitable relief." *Evans*, 762 F.3d at 1296 (internal quotation marks omitted).

Pennell first argues that she was an "eligible employee" under the FMLA "at all times relevant." Doc. 45 at 15.[4] The relevant timeframe pertains to Adam's accident in late-October of 2016 and events afterwards. In response, the Sheriff does not dispute

---

[4] Subject to exclusions not applicable here, the FMLA defines "eligible employee" as "an employee who has been employed—(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

Pennell's contention that she was an "eligible employee." Indeed, the record indicates that the Sheriff had employed Pennell for at least twelve months. The parties agree that she met the hourly requirement when she applied for FMLA leave in September of 2016, one month before Adam's accident. As such, this element is undisputed, and Pennell was an "eligible employee."

### i.  Grounds for Interference

Having determined that Pennell is an eligible employee, the Court turns to Pennell's grounds for interference. Pennell argues that the Sheriff "interfered with her FMLA *rights* in a few different ways." Doc. 45 at 17 (emphasis added). At the outset, the Court notes that "[b]ecause the FMLA grants employees many different rights, a plaintiff asserting an FMLA-interference claim must identify the *specific* right ([s]he says) was violated." *Walker v. United Parcel Serv., Inc.*, No. 18-62713-CIV-Altman/Hunt, 2021 WL 1089872, at *9 (S.D. Fla. Mar. 22, 2021) (emphasis in original) (citing *White*, 789 F.3d at 1200), *appeal filed*, No. 21-11267.

Here, Pennell's FMLA interference claim identifies only the right to utilize FMLA to care for her husband who had a serious health condition. Indeed, "[a]mong the substantive rights granted to an eligible employee by the FMLA [is] the right to 12 weeks of leave during any 12-month period in order to care for an employee's spouse if the spouse has a serious health condition . . . ." *Spraggins v. Knauf Fiber Glass GmbH, Inc.*, 401 F. Supp. 2d 1235, 1238 (M.D. Ala. 2005) (citing 29 U.S.C. § 2612(a)(1)(C)). Because Pennell's FMLA interference claim identifies only the right to utilize FMLA

leave to care for her husband, who had a serious health condition, the claim is limited to that right.

1. <u>Failure to Notify Pennell of Her Rights and Discouragement</u>

Pennell argues that the Sheriff "clearly knew" that she needed FMLA leave, but failed to notify her of her rights and discouraged her from completing FMLA paperwork, based upon the mistaken belief of Calandros and Strafford that Pennell needed to serve as Adam's "primary caregiver" to be eligible for FMLA leave while he was hospitalized. Doc. 45 at 17–18. Thus, this argument combines a lack-of-notice argument and a discouragement argument.

a. Notice

Beginning with Pennell's lack-of-notice argument, this argument is too undeveloped to warrant entry of summary judgment in Pennell's favor. Relying upon the regulation governing employer-notice requirements under the FMLA, Pennell argues that the Sheriff's failure to notify Pennell of her right to take FMLA leave may constitute FMLA interference. Doc. 45 at 17–18. To be sure, "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances. 29 C.F.R. § 825.300(b)(1). "Failure to follow the notice requirements . . . may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Id.* § 825.300(e). But Pennell fails to explain when

the Sheriff failed to provide notice. Whether she intends for this lack-of-notice argument to pertain to Calandros's conversation with Pennell while Pennell was in the hospital or some point after Adam was discharged from the hospital is unclear. Pennell fails to explain why the Sheriff "clearly knew" that she needed leave, given Calandros' interpretation that Pennell did not qualify. She fails to offer any analysis or explanation. Because this argument is undeveloped, Pennell does not carry her burden, and the Court will deny Pennell's motion as to this basis for interference.

### b.  Discouragement

Pennell also argues that the Sheriff interfered with her right to care for her husband by discouraging her from completing FMLA paperwork based upon the mistaken belief of Calandros and Strafford that Pennell needed to be Adam's primary caregiver to be eligible for FMLA leave while he was hospitalized. Doc. 45 at 18. "The Eleventh Circuit Court of Appeals has not addressed what constitutes an actionable discouragement claim. However, most courts that have addressed this issue find the employer's actions must be more than 'minimally intrusive,' and the employee must suffer some kind of prejudice or harm from the discouragement." *Corbin*, 2017 WL 1241430, at *2.

As stated above, the FMLA permits an employee to take leave to care for a spouse who has "a serious health condition." A "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(12). The

Department of Labor has defined "care for" in the context of the FMLA's medical certification provision, stating that "[t]he medical certification provision that an employee is needed to care for a family member . . . encompasses both physical and psychological care . . . . The term also includes providing psychological comfort and reassurance which would be beneficial to a . . . spouse . . . with a serious health condition who is receiving inpatient or home care." 29 C.F.R. § 825.124(a). The FMLA's provision of 12 workweeks of leave during any 12-month period to "care for" a spouse with a serious health condition is subject to the medical certification provision of § 2613, which states that an employer may require that an employee's request to "care for" a spouse with a serious health condition be supported by "a certification issued by the health care provider of the eligible . . . spouse . . . of the employee . . . ." 29 U.S.C. §§ 2612(a), 2613(a). Although 29 C.F.R. § 825.124 defines "care for" in the context of the medical certification provision, to which the provision of 12 workweeks of leave is subject, courts have applied the regulation's definition to "care for" in 29 U.S.C. § 2612(a). *Hoopingarner v. Corinthian Colls., Inc.*, No. 8:11-cv-397-JSM-TGW, 2012 WL 1551274, at *3 (M.D. Fla. Apr. 30, 2012); *see Tellis v. Alaska Airlines, Inc.*, 414 F.3d 1045, 1047 (9th Cir. 2005) (examining the predecessor regulation in 29 C.F.R. § 825.116(a), which was nearly identical to the current regulation, in explaining that "the Department of Labor's regulations implementing the FMLA define the phrase 'to care for'").

The parties agree that Adam suffered from "a serious health condition" while in the hospital. Adam testified that having Pennell next to him was comforting to him

and caused him to feel reassured in his fight and ultimate recovery. Doc. 44-6 at 152:6–11. Describing Pennell as his "constant normal," he explained that "[s]he was the only thing in my life at that time that was the consistent normal part of my life, and she was just there to comfort me and motivate me through everything." *Id.* at 153:5–9. Pennell also made decisions about his health. *Id.* at 152:12–17.

The parties agree that "[w]ithin days" of Adam's accident, Calandros and Strafford visited Adam's hospital room to speak with Pennell about FMLA leave. Doc. 66 ¶12. The parties also agree that Adam had suffered a "serious health condition" as a result of the accident and that Calandros and Strafford understood that Adam would be in inpatient care for "some time." *Id.* at ¶13. It is undisputed that Adam was not released from the hospital until December 3, 2016. Doc. 44-6 at 22:21–25

The parties also do not dispute that Calandros informed Pennell during this hospital visit that Pennell was not qualified for FMLA leave. Calandros testified that she went to the hospital to give Pennell "the FML[A] documents." Doc. 44-8 at 19:10–12. She told Pennell that she wanted to give her the FMLA paperwork and that although Pennell did not qualify at that time, the paperwork would "come into play" when "Adam was able to be moved to where [Pennell] would be the caregiver . . . ." *Id.* at 21:9–15. She told Pennell, "I'm just here to give you the FML[A] paperwork just so we can . . . put you on FML[A] whenever he's released to the point where you're going to be the caregiver." *Id.* at 21:18–20.

Thus, Calandros testified that she believed that Pennell would have been eligible for FMLA leave only if she was Adam's "caretaker." *Id.* at 27:13–17. Calandros's

19

belief that Pennell was not qualified for FMLA leave while Adam was in the hospital was based upon her education, experience, and the FMLA "certification on the form," which listed questions like "Are you the caregiver?" *Id.* at 25:1–9. According to Calandros, Pennell "didn't qualify" and "was not going to be the caregiver" based upon the certification's criteria. *Id.* at 26:5–13. She conceded that she did not tell Pennell to fill out the paperwork with a doctor and submit to the Polk County Sheriff's office to determine whether she was eligible. *Id.* at 29:12–18. She also testified that at the time of her deposition, she believed that an employee must be the "primary caregiver" of a spouse with a serious health condition in order "for the spouse to be protected under the FMLA," but she did not recall telling Pennell that Pennell needed to be Adam's "primary caregiver." *Id.* at 30:4–16.

Strafford, whose "main job duties" were to process FMLA documents and light-duty requests, testified that she and Calandros visited Pennell in the hospital twice and testified that the first visit pertained to "open enrollment" and that the second visit "could have been for FMLA," but she could not recall. Doc. 45-19 at 7:8–12, 20:20–25, 21:1–6. Indeed, Strafford could not recall any discussion in the hospital with Pennell about FMLA leave. *Id.* at 21:7–17. She could not recall whether she was present during a time when Calandros gave FMLA documents to Pennell. *Id.* at 24:7–10. However, she testified to her opinion that Pennell was not entitled to FMLA while Adam was in the hospital because she was not Adam's "caregiver or primary caregiver," rationalizing that Adam "was hospitalized and being cared for by his doctors, so she wasn't providing him any care as if he was home." *Id.* at 22:2–10. She

20

testified that her belief was based on the training that she received "based on the FMLA criteria." *Id.* at 22:14–19.[5] Strafford could appreciate that Pennell would have been in the hospital to provide comfort, love, and reassurance to him during the difficult time. *Id.* at 25:23–25, 26:1–3.

According to Pennell, Calandros and Strafford informed her during their visit to the hospital on October 31 that she did not qualify for FMLA leave because she was not Adam's "primary caretaker"—the hospital served as the primary caretaker—and that her "only option was to take a leave of absence from work." Doc. 44-13 at 156:10–25, 157:1–8. Pennell testified that they explained that taking an unpaid leave of absence would require her to submit paperwork every two weeks for approval. *Id.* at 159:15–24. Pennell was under the impression that the chief would need to approve it on a week-to-week basis and that approval was not guaranteed. *Id.* Pennell believes that she was qualified based upon the paperwork that Calandros and Strafford gave to her, which "outlined the qualifications," including "car[ing] for a loved one." *Id.* at 157:21–25, 158:1–2.

Calandros's interpretation of Pennell's eligibility for FMLA leave during her discussion with Pennell was incorrect. Under the FMLA, Pennell could take leave "in order to care for" Adam, who had a "serious health condition," which is defined, in part, as "inpatient care in a hospital . . . ." 29 U.S.C. §§ 2611(12), 2612(a)(1)(C). And

---

[5] Strafford also testified that if Pennell had completed the FMLA application and did not qualify, the process would not have proceeded any further. Doc. 45-19 at 7:16–21, 24:14–22.

"care for" encompasses "both physical and psychological care," as well as "providing psychological comfort and support which would be beneficial to a . . . spouse . . . with a serious health condition who is receiving inpatient care *or* home care." 29 C.F.R. § 825.124(a) (emphasis added). These provisions do not afford eligibility only if an employee is a "primary" caregiver of her spouse. Nor do the provisions afford coverage only if the employee's spouse is at home; they contemplate an employee taking leave to care for a spouse who is in inpatient care in a hospital. The testimony above demonstrates that Pennell was caring for Adam, as she was providing comfort and support that was beneficial to him while he was in the hospital. In response, the Sheriff does not argue that Calandros's interpretation—or Strafford's interpretation—was correct.

Thus, there is no dispute that Calandros incorrectly told Pennell that she did not qualify for FMLA leave while she was in the hospital, even though Pennell, an employee of the Sheriff, was providing "care for" her spouse, who had a "serious health condition." There is no dispute that Pennell did not apply for FMLA while Adam was in the hospital, but instead later completed LWOP requests for her time with Adam in the hospital.

The Sheriff argues in response that Pennell's discouragement claim must fail because Pennell was never denied a benefit since she did not *apply* for FMLA leave at any point while Adam was in the hospital. Doc. 55 at 9. But this argument ignores the regulation which clarifies that FMLA interference includes discouraging an employee from using leave. The Sheriff adds that Pennell could have "easily obtained

documentation" from Adam's doctors if she had believed that she would qualify for FMLA leave as his caretaker. *Id.* at 10. However, when viewing all the evidence in the light most favorable to the Sheriff and drawing all reasonable inferences in his favor, this argument does not address why Pennell would believe at the time when Adam was in the hospital that she qualified for FMLA leave. The Sheriff's Benefits Supervisor, in giving Pennell FMLA paperwork, explicitly told her that she was not eligible and to wait until Adam was discharged to the point where Pennell would be the caregiver. The Sheriff also argues that Pennell has offered no evidence "other than"—and those are the key words—the conversation in October of 2016 that she was pressured into not applying for FMLA. *Id.* at 3. But the evidence shows that the conversation involved Calandros informing Pennell that she was not eligible for FMLA leave, even though she was caring for Adam, who had a serious health condition. As such, these arguments fail.[6]

Based on the foregoing, Pennell demonstrates that the Sheriff discouraged her from using FMLA leave. However, the Court must examine whether a genuine dispute exists as to any resulting prejudice, which is discussed below.

## 2.  Delayed Approval of FMLA Leave

Pennell also argues that although the Sheriff was on notice that Pennell was providing emotional, psychological, and physical care for her husband, the Sheriff

---

[6] The Sheriff also argues in response to Pennell's motion that Pennell's claim for interference based upon inadequate notice must fail. Doc. 55 at 12–14. Given the analysis about notice above, the Court need not address this argument.

"delayed the approval" of her FMLA leave, which resulted in Pennell remaining on the Sheriff's unpaid leave of absence until December 12, 2017. Doc. 45 at 18.

Viewing the evidence in the light most favorable to the Sheriff, the record does not support Pennell's argument that the Sheriff "delayed approval" of her FMLA leave such that she remained on an unpaid leave of absence until December 12, 2017.[7] Calandros testified that she told Pennell that the paperwork would "come into play" when "Adam was able to be moved to where [Pennell] would be the caregiver . . . ." Doc. 44-8 at 21:9–15. In deposition testimony that Pennell relies upon, Calandros testified that she told Pennell, "I'm just here to give you the FML[A] paperwork just so we can . . . put you on FML[A] whenever he's released to the point where you're going to be the caregiver." *Id.* at 21:18–20. Adam was discharged from the hospital on December 3, 2016. Doc. 44-6 at 22:21–25. But, despite receiving the FMLA paperwork when Adam was in the hospital, Pennell did not apply for FMLA leave following Adam's discharge from the hospital.

Instead, the evidence shows that she submitted a LWOP request on December 15, 2016, which covered December 5, 2016, to December 18, 2016. Doc. 45-2 at 4. The parties agree that Garcia sent a text message to Pennell on December 19, 2016, reminding Pennell that she should be eligible for FMLA leave now that she was Adam's caretaker. In response, Pennell replied that Human Resources told her that

---

[7] To the extent that this argument stems from her conversation with Calandros about not being eligible for FMLA leave because she was not Adam's primary caretaker, Pennell's prior argument covers that basis.

she does not qualify for FMLA because she had not worked enough hours. Doc. 45-4 at 1. Pennell testified that neither Calandros nor Strafford discussed hours when they visited her in the hospital. Doc. 44-13 at 207:14–16. Pennell then filed three LWOP requests, covering December 19, 2016 to January 26, 2017, on December 25, 2016. Doc. 45-2 at 5–7. The evidence shows that Pennell applied for FMLA leave the first time on January 9, 2017, after Strafford sent an e-mail to Pennell on January 5, 2017, which enclosed FMLA documents and explained that the benefits officer received notification that Pennell may be eligible for FMLA leave. Doc. 45-5 at 1–2. The parties agree that Pennell stated that she would take the verification to Adam's doctor once she received it; that she received the verification from the Sheriff on January 10, 2017, and delivered the verification to Adam's physician at the Watson Clinic on that date; that she notified Strafford on January 12, 2017, that the clinic had indicated that the FMLA paperwork would be ready by January 20, 2017; that Strafford advised Pennell on January 24, 2017, that her application for FMLA leave had been preapproved; and that the Sheriff fully approved her application for FMLA leave to care for Adam on January 26, 2017, and that Pennell was retroactively approved for FMLA leave from December 12, 2016, to January 23, 2017.

Thus, although Adam was discharged from the hospital on December 3, 2016, Pennell subsequently filed a LWOP request covering December 5, 2016, to December 18, 2016, and did not file an application for FMLA leave until January 9, 2017. On January 12, 2017, she advised that the clinic told her that the FMLA paperwork would be ready by January 20, 2017. The following week, the Sheriff approved her FMLA

application and retroactively approved Pennell for FMLA leave from December 12, 2016, to January 23, 2017. The evidence does not show that the Sheriff "delayed the approval" of Pennell's request for FMLA leave such that Pennell "remained on [the Sheriff's] unpaid leave of absence until December 12, 2017." Pennell fails to offer any further explanation of this argument, articulating the argument in only two sentences. As such, Pennell fails to demonstrate that the Sheriff interfered with her right to care for Adam by "delaying the approval" of her FMLA leave such that she remained on unpaid leave of absence until December 12, 2017.

3. <u>Instructed to Return to Work Early, Despite FMLA Approval</u>

As a third basis for interference, Pennell argues that "despite being approve[d] for FMLA leave through January 23, 2017," she was instructed to return to work a week early. Doc. 45 at 18.

The evidence shows that Pennell's LWOP requests for December 19, 2016, through January 12, 2017, were approved on January 5, 2017. Doc. 45-2 at 5–6; Doc. 44-1 at 30–31. Pennell's LWOP request for January 16 through January 26 was still pending at that time. Doc. 45-2 at 7; Doc. 44-1 at 28.  Also on January 5, Strafford sent the e-mail to Pennell which informed her that she may be eligible for FMLA leave. Pennell testified that Captain Ian Floyd called her on or about January 5 and instructed her to return to work on January 16. Doc. 44-13 at 188:9–12. Pennell testified that she told him that she had a doctor's note indicating that she needed to stay out. *Id.* at 188:12–13. According to Pennell, Floyd said that Human Resources had told him that

26

"that's not true" and that Dan Boreland, the nurse manager associated with workers'
compensation, had informed him that Adam "did not need a caretaker." *Id.* at 188:18–
25, 189:1–4. Boreland drafted a letter to Dr. Kazmier on January 8, 2017, inquiring
whether Adam required a home health aide, to which Dr. Kazmier indicated that
Adam did not require an aide. Doc. 45-6 at 1; Doc. 44-13 at 382.[8] Pennell testified that
Adam did not require a home health aide because she had been trained to take care of
Adam. *Id.* at 191:21–25, 192:1–10. Floyd could not recall instructing Pennell to return
to work or any conversation with her related to her return to work and when that
would occur. Doc. 44-10 at 42:22–25, 43:1–18.[9] Because the Court must view the
evidence in the light most favorable to the Sheriff, Floyd's testimony warrants denying
Pennell's motion to the extent that Pennell seeks summary judgment on her FMLA
interference claim on the basis that she was instructed to return to work a week early,
even though she received FMLA leave through January 23.

Even if Floyd instructed Pennell to return to work, Pennell's argument still fails.
The parties agree that a few days later, on January 9, Pennell sent her FMLA
application and indicated that she would take the verification to Adam's doctor once
she received it. The parties also agree to these facts: on January 9, 2017, Pennell sent

---

[8] The copies of the letter in the record obscure the date of Dr. Kazmier's signature.

[9] In responding to Pennell's motion, the Sheriff argues that someone asked Pennell—the
Sheriff does not specify who—to return to work on January 16 after the Polk County Sheriff's
office "received a note dated January 8, 2017," which was signed by one of Adam's doctors
and indicated that Adam "no longer needed a home health aide." Doc. 55 at 4. Presumably,
the Sheriff refers to Boreland's January 8, 2017 letter to Dr. Kazmier. However, the Sheriff
fails to cite any factual support for this proposition.

her FMLA application and indicated that she would take the verification to Adam's doctor once she received it; on January 10, 2017, Pennell received the verification from the Sheriff and delivered the verification to Adam's physician; on January 12, 2017, Pennell notified Strafford that she had delivered the FMLA verification to Adam's doctor and that the clinic had indicated that the FMLA paperwork would be ready by January 20, 2017.

The parties also agree that Pennell worked on January 16, 17, 20, 21, and 22. *Id.* Afterwards, Boreland submitted another letter from Dr. Kazmier, which stated that Adam required a home health aide because he could not dress himself or drive until January 23, 2017. Doc. 45-9 at 1. The parties agree that Boreland submitted this letter to the Sheriff on January 23. And the parties agree that Strafford advised Pennell that her FMLA application had been preapproved on January 24, 2017, and that the Sheriff fully approved her FMLA application on January 26, 2017; she retroactively received FMLA leave from December 12, 2016, to January 23, 2017.

Thus, Pennell had not received FMLA leave, nor was she on FMLA leave, when she returned to work on January 16, 2017. She had submitted her FMLA application, and the clinic had advised her that the paperwork from the clinic would not be ready until January 20, 2017. She testified that her FMLA paperwork "was completed and sent" to Human Resources at some point during the timeframe between her return to work on January 16 and the subsequent days when she worked. Doc. 44-3 at 201:8–15. Pennell does not point to any evidence indicating that her application

28

was complete by January 16, 2017, either.[10]  Therefore, Pennell fails to demonstrate that the Sheriff interfered with Pennell's right to care for Adam, who had a serious health condition, under the FMLA when Floyd instructed Pennell to return to work "early."

### 4. Request for Intermittent Leave

Fourth, Pennell argues that upon her return to work, Garcia denied her request to "take time off intermittently" to assist Adam "with issues related to his injuries" because the shift was short-staffed. Doc. 45 at 18. In support, Pennell cites only to Garcia's testimony to argue that Pennell requested part of her shift off at certain times to assist Adam with "something related to his injuries" and that Garcia denied those requests because the shift was "short." *Id.* at 13 (internal quotation marks omitted). Indeed, Garcia testified that Pennell wanted part of her shift off at certain times and that Garcia denied those requests because the shift was "short." Doc. 44-11 at 48:19–25, 49:1–3. But Garcia also testified that she could not recall whether Pennell specified that the reason that she wanted to leave was to help Adam; she remembered only that Pennell "wanted at certain times to only work part of a shift." *Id.* at 49:6–11. Pennell fails to demonstrate Garcia's denial of Pennell's requests to work part of her shifts at

---

[10] In her motion, Pennell cites to her January 12, 2017 e-mail to Calandros, in which she stated that the "initial note from Dr. Braden stated that [she] should be able to return after January 31 and that would still be the plan." Doc. 45-7 at 1. But Pennell does not point to any evidence in the record that she provided this note to Calandros or the appropriate personnel at the Sheriff's office.

some unspecified point after she returned to work constitutes interference with her right to care for Adam under the FMLA.

### ii. Prejudice

Showing that the Sheriff technically violated the FMLA is not enough; Pennell must demonstrate that the violation prejudiced her in some way, meaning that she must demonstrate that either damages or equitable relief can remedy the harm. *See Evans*, 762 F.3d at 1295–6; *Andrews v. CSX Transp., Inc.*, No. 3:06-cv-707-TJC-HTS, 2009 WL 5176462, at *2 (M.D. Fla. Dec. 22, 2019) ("The FMLA provides no relief unless the employee has been prejudiced by the violation; 'the remedy is tailored to the harm suffered.'"). The FMLA "provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (internal citations omitted).

Pennell represents that "fact issues surrounding the damages suffered and the value thereof" exist and that "leav[ing] the prejudice/harm issue for the Court and/or jury" is appropriate. Doc. 45 at 23. Of course, because a plaintiff seeking to prove FMLA interference must show that the violation prejudiced her in some way, the Court must deny Pennell's motion if a genuine dispute of material fact exists as to the prejudice suffered by Pennell. Nonetheless, because Pennell also argues that she suffered a few types of harm, the Court will analyze the arguments.

1.  <u>Denial of Annual Step-Raise</u>

Pennell argues that she was denied her annual step-raise because she had more than 96 hours of unscheduled time off, which, under the Sheriff's General Order, includes an unpaid leave of absence. Doc. 45 at 20. Conceding that "the math may appear fuzzy," Pennell nonetheless argues that she would not have exceeded the 96-hour limit if the Sheriff had properly characterized her leave as FMLA leave (rather than an unpaid leave of absence) while Adam was hospitalized. *Id.*

General Order 22.1 E.(11)(s) provides: "Effective for all performance evaluations, absences utilizing unscheduled paid time off and/or a leave of absence without pay in excess of the allotted ninety-six (96) hours of unscheduled absences per year (excluding FMLA leave) shall be considered excessive and result in the loss of a step pay increase merited in that fiscal year." Doc. 45-3 at 21. The parties do not dispute that Pennell's performance evaluation indicated that Pennell had used 330 hours of FMLA and 129 hours of sick/unscheduled paid time off. Indeed, Pennell provides the performance evaluation, which lists 459 hours under "Total Hours Sick/Unscheduled Time Off Leave Used," with only 129 hours of "Net Hours Sick/Unscheduled Paid Time Off Leave Used" remaining after subtracting 330 hours of "Family Medical Hours Used." Doc. 45-12 at 3. The performance evaluation states: "In accordance with GO 22.11 E.(11)(s), D/S Pennell has 129 hours of unscheduled paid time off during this annual evaluation cycle and since her unscheduled paid time off exceeds (96) hours, she is not eligible for a pay/step increase." *Id.* at 4. The final page of the evaluation indicates that Pennell received 98 points, which fell short of the

100 points to qualify for an annual step increase. *Id.* at 5. Pennell received 0 points in the "Sick/Unscheduled Paid Time Off Leave" category, under which the reviewer must award either 0 points or 10 points. *Id.*

Pennell argues that she exceeded the 96-hour threshold because the time that she received while she was in the hospital with Adam was characterized as an unpaid leave of absence and that leave was "the reason" that she did not receive her step increase. Doc. 45 at 10. Pennell cites to her deposition and Garcia's deposition for factual support. *Id.* But Garcia simply testified that Pennell would have received over 100 points if she had received 10 points under the "Sick/Unscheduled Paid Time Off Leave" category. Doc. 44-11 at 59:25, 60:1–4. Pennell testified that part of the reason that she did not receive a pay increase was because she had unscheduled time from Adam's accident. Doc. 44-13 at 223:14–16.

When asked to clarify her testimony that she believed that some of those hours were related to the time that she had taken off to spend with Adam, Pennell explained: "That's how it was portrayed to me. She [Garcia]—the conversation was, like, hey, I'll look into this for sure, but I believe it's because some of this was for Adam." *Id.* at 229:19–22. However, Pennell conceded that she did not know for sure that some of the hours were related to time that she had taken off to spend with Adam. *Id.* at 229:23–24.  Pennell also admitted that she would not be surprised if she was still over the hourly limit if the Sheriff had backed out all of her FMLA time and all the hours when she was on unpaid time off to be with Adam, as she had experienced medical issues that year. *Id.* at 230: And she admitted that she later learned that "it was because of

32

time between June and [Adam's] accident." *Id.* at 233:3–16. Indeed, in one portion of cited deposition testimony, Pennell testified that she later learned that the FMLA and unscheduled time off had been backed out of the evaluation, and she appeared to concede that it was no longer a concern. *Id.* at 240:16–25, 241:1–11.[11] Without providing pinpoint citations or any explanation, Pennell cites to 43 pages of records to argue that she used more than 200 hours of unpaid time as part of her unpaid leave of absence between October 29, 2016, and December 11, 2016. Thus, Pennell's cited evidence fails to demonstrate that the Sheriff denied her a step increase because her time off with Adam was characterized as an unpaid leave of absence.

Looking to the Sheriff's evidence reinforces the lack of factual support. In response, the Sheriff points to the testimony of Payroll Supervisor Lisa Wojdyla. Doc. 55 at 5.[12] Wojdyla testified that during the ratings cycle for Pennell's performance review, Pennell had accumulated a total of 1,291.50 unscheduled hours, but 1,186 of those hours were considered "protected" leave and would not count towards the calculation of the 96-hour disqualifier for her annual performance review for that

---

[11] Pennell cites to this testimony and other testimony in her motion to argue that "there was a confusing line of question and answer regarding the manner in which the hours were calculated" during her deposition, which, she contends, "is further proof that there is a genuine issue of material fact as to whether [the Sheriff] properly calculated the time off in determining whether [Pennell] received a step raise." Doc. 45 at 9 n.15. However, this testimony does not reveal any "confusing line" of questioning about the calculation of hours, let alone one that results in a genuine issue of material fact.

[12] Although the Sheriff does not explicitly cite to the document number in responding to Pennell's motion, he provides Wojdyla's two affidavits with his motion. Pennell also provides the relevant affidavit with her motion (Doc. 45-17).

ratings cycle. Doc. 44-3 at 3. She testified that these "protected" hours include all hours in which Pennell spent with Adam on an approved, unpaid leave of absence while he was in the hospital. *Id.* She also explained that the protected hours included "all hours spent during that rating cycle, either on FMLA leave or worker's compensation." *Id.* After deducting the 1,186 "protected hours" from the 1,281.50 unscheduled hours, Pennell had 105.50 unscheduled hours remaining during the 2016-2017 rating cycle. *Id.* at 4. As such, Wojdyla testified that Pennell was not qualified under the General Orders to receive a step increase because the 105.5 unscheduled hours surpassed the 96-hour threshold. *Id.*

Wojdyla testified that this calculation of 105.5 unscheduled hours is correct, even though the performance report indicated that Pennell had incurred 129 unscheduled hours. *Id.* Wojdyla described the calculation of 129 hours as a "simple mistake" by the Payroll Department at the time and that even with this mistake, Pennell "was still over the 96-hour requirement and thus, the unscheduled hours disqualifier indicated in the General Orders was triggered." *Id.*[13] Thus, Pennell fails to demonstrate that she suffered prejudice in the form of not receiving her step-increase.

2.   Holiday Hours and PTO

---

[13] Anticipating the Sheriff's reliance on Wojdyla's testimony, Pennell argues that Wojdyla's testimony about the "protected" hours just "[a]dd[s] to the confusion" and points out the discrepancy between the hours reported in the performance report and Wojdyla's affidavit. For the reasons discussed above, Pennell fails to demonstrate that the Sheriff denied her a step increase because her time off with Adam was characterized as an unpaid leave of absence.

Next, Pennell argues that she suffered prejudice because the Sheriff penalized her "by giving her negative holiday hours," for which she did not receive compensation, and that when she began accruing PTO time upon her return to work, the Sheriff "took that accrued leave and used it to 'pay back' the negative holiday time." Doc. 20–21. Describing this issue as "confusing," Pennell argues that penalizing her with negative 48 hours of holiday hours only to use earned PTO to "wash it out is tantamount to forcing [Pennell] to return to work from FMLA leave and work for free during her first week." *Id.* at 21.

Pennell points to several documents to argue that the Sheriff "took negative 40 hours of holiday pay" from her while she was on an unpaid leave of absence. During her deposition, Pennell testified that "if you take holiday pay before the actual holiday, you go into the negative." Doc. 44-13 at 199:19–25. As a result, when she returned to work, she "had negative hours" and "anything [she] did accrue went towards the negative hours." *Id.* at 199:25, 200:1. She also clarified that employees typically received all 80 hours of holiday time at one time in October. *Id.* at 200:7–12. According to Pennell, "if you take that holiday for something like this before the holiday actually hits—so if I take Christmas in mid-November, then—and I use all my time, I was negative those hours." *Id.* Pennell also testified to her belief that she earned 11.5 hours of PTO each month and that she could use a "bank" of PTO hours for vacation time or sick time. *Id.* at 55:11–25.

Pennell also points to an e-mail from her to Wojdyla, dated January 30, 2017. Believing that she had acquired 24 PTO hours from the months of December and

January, Pennell asked Wojdyla whether she would "receive[] these hours back in the bank" or whether she would be paid for them. Doc. 45-10 at 1. Wojdyla responded:

> I have not issued benefit hours for the month of January yet, they will be post[ed] by 5:00 tomorrow. I estimate that you will earn 6 PTO hours. This is due to having only 580 hours of paid time in the month of January. (see GO 22.11) You did not earn PTO hours for the month of December, since you had no paid time during that month. Also, please keep in mind that you have used unearned Holiday time in advance as well. You are currently in the negative -40 hours. Holiday hours are done the same as PTO/Vacation. In order to earn them, you had to have paid work/leave time during that holiday time period.

According to Wojdyla, whose affidavit Pennell provides, "an employee does not accrue PTO while on unpaid FMLA leave or any other unpaid leave of absence" because an employee seeking to accrue PTO "would have had to have had actual paid hours during an applicable month." which applies for any type of unpaid leave, including FMLA. Doc. 45-17 at 3–4. She also stated that the Polk County Sheriff's office previously required an employee to use a bank of holiday PTO hours that may not have been accrued until some point in the future. *Id.* at 4. According to Wojdyla, "[i]n this particular case," Pennell "used several hours of holiday PTO that ran concurrent with her unpaid leave and resulted in her having a negative forty hours of holiday pay upon her return to work." *Id.* Wojdyla states that Pennell did not lose "any other benefits to which she would have been entitled during the time that she was out on an approved leave of absence without pay while at the hospital with her husband, and shortly thereafter." *Id.* at 3.

Pennell also broadly cites to 28 pages of payroll records to argue that on the pay period ending on December 18, 2016, the Sheriff "began taking holiday PTO hours"

from her, which continued to the pay period ending on February 12, 2017. Doc. 45 at

11–12. Citing only these records, Pennell argues that she did not receive compensation

for the holiday hours that were used against her. *Id.* at 12. Citing the records again, she

argues that she had accrued 43.5 PTO hours by the pay period ending on May 7, 2017,

and that the Sheriff used the earned PTO to reduce the negative holiday hours from

48 to 4.5. *Id.*

Pennell does not clearly articulate her argument for prejudice here. Her citation

to 28 pages of payroll records without any accompanying pinpoint citation violates the

instructions of the Case Management and Scheduling Order. Doc. 14 at 6 (requiring

the movant to "provide pinpoint citations to the pages and lines of the record

supporting each material fact).[14] Pennell also fails to walk the Court through these

records; instead, she dumps them before the Court without any meaningful

explanation. A review of the records reveals that: beginning on the December 18, 2016

pay period, Pennell's payroll records indicated "negative" holiday hours; beginning

on the February 12, 2017 pay period, her payroll records indicated PTO hours;

Pennell's payroll record for the May 5, 2017 pay period indicated 43.5 PTO hours and

"negative" 48 holiday hours; and Pennell's payroll record for the May 21, 2017 pay

period—the next pay period—indicated only "negative" 4.5 holiday hours. Doc. 45-

16 at 15, 19, 25–26. To be sure, subtracting 43.5 from 48 produces 4.5. But Pennell

fails to explain how these records support the proposition that she "was not paid for

---

[14] *See also* Rule 56(c)(1)(A), Fed. R. Civ. P.

the holiday hours that were used against her." Doc. 45 at 12. And she fails to link any taking of "negative" holiday hours or application of PTO hours to "negative" holiday hours to the discouragement described above. In sum, this argument is not clearly articulated—"confusing," to borrow Pennell's terminology.[15] Because Pennell's argument is undeveloped, she fails to carry her summary-judgment burden with respect to this prejudice argument.

### 3.  Other People Providing Care

Third, Pennell argues that other people "necessarily became responsible" for Adam's care after the Sheriff forced her to return to work a week earlier than when she was approved. Doc. 45 at 21. Similarly, Pennell argues that she and her husband needed to find someone else to "help them" after Garcia denied Pennell's intermittent-leave request. *Id.* The Court, above, rejected Pennell's argument about the Sheriff requiring her to return to work a week early. Pennell highlights Adam's testimony, in which he testified that "[d]uring the first week or so" after his discharge on December 3, 2016, which was several weeks before Pennell's return to work in January, Pennell helped him with "everything" because he could not dress himself, shower, or retrieve meals. Doc. 44-6 at 153:15–22. He also agreed that "there were periods of time" when Pennell's parents helped out, but Pennell provided "the bulk of assistance." *Id.* at 154:4–8. This argument is undeveloped. Pennell does not provide any evidence that other people "necessarily became responsible" for Adam's care when she returned to

---

[15] Separately, the Court notes that the Sheriff discusses Pennell's argument about the holiday hours, but fails to cite to any evidence. Doc. 55 at 6–7.

work in January such that she suffered prejudice. As to Garcia's denial of Pennell's intermittent-leave request, the Court explained above that Pennell failed to demonstrate that Garcia's denial of her requests to work part of her shifts at some unspecified point after she returned to work constitutes interference with her right to care for Adam under the FMLA. Pennell does not provide any evidence to support her contention that she and Adam needed "to find someone else to help them" when Garcia denied the requests. As such, Pennell fails to carry her summary-judgment burden with respect to these prejudice arguments.[16]

Because Pennell fails to establish that she suffered prejudice or that no genuine issue of material fact exists as to whether she suffered prejudice, the Court will deny the motion.

### B. The Sheriff's Motion for Summary Judgment

#### i. FMLA Interference (Count I)

Turning to the Sheriff's motion, the Court begins with Pennell's FMLA interference claim. The Sheriff offers two arguments: (1) Pennell's claim for interference based upon discouragement or deterrence must fail; and (2) Pennell's claim for interference based upon inadequate notice must fail. Doc. 44 at 18–21.

#### 1. Discouragement

---

[16] Although Pennell seeks summary judgment only on liability, she generally argues that equitable relief is appropriate. Doc. 45 at 21–23. For example, she argues that entering "an award in equity to address the effect [of the Sheriff's] interfering behavior" would cure Pennell's stress. *Id.* at 22. Because Pennell seeks summary judgment only on liability, and given the analysis above, the Court need not address this issue.

For the first argument, the Court will deny the Sheriff's motion. The Court explained above that the record demonstrates that the Sheriff discouraged Pennell from using FMLA leave. The Sheriff now repeats the arguments that he offered in opposition to Pennell's motion, such as contending that Pennell has offered no evidence that she was pressured into not applying for FMLA leave, "other than" her conversation with Calandros and Strafford, and that "[t]here was nothing stopping Pennell" from applying for FMLA leave. Doc. 44 at 18–19. The Sheriff's arguments ignore the relevant regulation and the evidence.

The Sheriff argues that Pennell cannot demonstrate any prejudice because she received leave without pay during the time when Adam was in the hospital and afterwards and even received an additional two weeks of protected time off that the FMLA would not have provided. The Sheriff does not cite to any evidence for this proposition. However, the Court notes that Wojdyla states that if Pennell had received FMLA leave beginning on October 29, 2016, she would have run out of hours on December 27, 2016, as she would have exhausted her FMLA hours for the rolling calendar period at that time. Doc. 44-4 at 3–4.

In response, Pennell addresses prejudice generally, arguing that she suffered prejudice as a result of the Sheriff's interference when the Sheriff: (1) denied her leave improperly; (2) denied her step increase; (3) assessed negative holiday hours and required her to pay those hours back with newly accrued PTO hours; and (4) required others to be responsible for her husband's care. Doc. 57 at 15–16. For the first ground, in the context of the discouragement claim, Pennell fails to explain why

discouragement itself constitutes prejudice. Indeed, as explained above, Pennell must demonstrate that she suffered some type of prejudice or harm from the discouragement. *Corbin*, 2017 WL 1241430, at *2. For the second ground, as explained above, Pennell conceded that she did not know for sure that some of the hours were related to time that she had taken off to spend with Adam; admitted that she would not be surprised if she was still over the hourly limit if the Sheriff had backed out all of her FMLA time and all the hours when she was on unpaid time off to be with Adam, as she had experienced medical issues that year; admitted that she later learned that "it was because of time between June and [Adam's] accident"; and testified that she later learned that the FMLA and unscheduled time off had been backed out of the evaluation, while appearing to concede that it was no longer a concern. As to other people becoming responsible for Adam's care, Pennell tied this to her return to work in January and Garcia's denial of her intermittent-leave requests in her response.

But the payroll records pose an obstacle to the Sheriff's prejudice argument. As explained above, Pennell argues that the payroll records demonstrate prejudice because they show that the Sheriff began taking holiday PTO hours from her while she was caring for Adam and, after her return to work, the Sheriff applied her earned PTO hours to reduce those "negative" holiday hours. Indeed, as discussed above, the records generally indicate "negative" holiday hours beginning on the December 18, 2016 pay period, the subsequent accumulation of PTO hours, and only "negative" 4.5 holiday hours remaining on the May 21, 2017 pay period, whereas the prior pay period indicated "negative" 48 holiday hours and 43.5 PTO hours. The Case Management

41

and Scheduling Order and the Local Rules provide the Sheriff with leave to file a reply, but the Sheriff failed to reply to this argument.[17] Even though Pennell fails to show that these records were sufficient to establish prejudice such that summary judgment in her favor is warranted, the records are sufficient to raise a genuine dispute of material fact in response to the Sheriff's motion. In the absence of any argument, with evidence, adequately addressing these records, entry of summary judgment in the Sheriff's favor is improper. As such, the Sheriff's motion is denied as to this ground.

## 2.   Notice

The Sheriff also argues that "Pennell seems to make a claim that she was entitled to FMLA leave once her husband was out of the hospital and her employer was on notice that her husband needed care until January 31, 2017." Doc. 44 at 20. This argument pertains to paragraph 17 of Pennell's complaint, where Pennell alleges:

> On December 3, 2016, Mr. Pennell was discharged from the hospital. Upon his return home, [Pennell] had to help her husband with most of his life activities. As a result, Mr. Pennell's doctor provided [Pennell] with a note stating that she received the proper training to care for Mr. Pennell until January 31, 2017. [Pennell] provided the note to [the Sheriff].

Doc. 1 ¶17.

The Sheriff argues that the record lacks any evidence that Pennell provided this note to any person in Human Resources; at best, she sent a picture of the message to Captain Garcia on July 18, 2017, when arguing that she should have received a raise that year. Doc. 44 at 20.

---

[17] And as mentioned above, Pennell's argument about the holiday hours in her response fails to cite to any evidence.

Thus, the Sheriff argues that he is entitled to summary judgment to the extent that Pennell bases her FMLA interference claim upon a failure of the Sheriff to give her FMLA leave on account of the note about care until January 31, 2017 that she provided after Adam left the hospital. The parties agree that Pennell sent a text message to Garcia on July 18, 2017, which contained a photograph of the November 30, 2016 doctor's note that addressed the length of time for which Adam would need care.[18] In responding to the Sheriff's motion, Pennell does not challenge the Sheriff's assertion that the record lacks evidence that Pennell provided this note to any person in Human Resources nor does Pennell provide any evidence that she provided this note to the appropriate personnel at the Sheriff's office in anticipation of, or following, Adam's departure from the hospital. However, the Sheriff must also address prejudice, which is discussed below.

In only two sentences, the Sheriff also argues that the record lacks evidence that he failed to meet his obligations under 29 C.F.R. §§ 825.300(b)–(d) when he did not take it upon himself to apply for FMLA for Pennell, explaining that an employer has an obligation to provide the employee "with certain information" when the employer is placed on notice. *Id.* That regulation, in part, imposes requirements for the contents of eligibility notices, rights-and-responsibilities notices, and designation notices. 29 C.F.R. § 825.300(b)–(d). For example, § 825.300 provides that "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's

---

[18] Indeed, the Sheriff provides a copy of that text message. Doc. 44-14 at 257. However, the image of the note is blurry, and no party points to a legible copy of the note in the record.

43

leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." *Id.* § 825.300(b)(1). "If the employee is not eligible for FMLA leave, the notice must state at least one reason why the employee is not eligible, including as applicable the number of months the employee has been employed by the employer" and "the hours of service with the employer during the 12-month period." *Id.* § 825.300(b)(2). "Notification of eligibility may be oral or in writing." *Id.*

Similarly, for designation notices, "[t]he employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for giving notice of the designation to the employee as provided in this section." *Id.* § 825.300(d)(1). "When the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason (e.g., after receiving a certification, the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances." *Id.* Notably, as highlighted above, "[f]ailure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Id.* § 825.300(e).

In addition to arguing that the record lacks evidence that the Sheriff failed to meet its obligations under 29 C.F.R. § 825.300, which covers several different types of notices, the Sheriff cursorily focuses on Pennell's time in the hospital, asserting that if Pennell argues that she was not provided proper notice, "this is simply untrue" because "she admits she was provided with a [sic] FMLA paperwork while in the hospital and

told to apply when she became the caretaker." *Id.* at 44 n.4. Aside from failing to cite to any evidence, the Sheriff fails to offer any explanation or analysis as to why these actions are sufficient under the relevant regulation about eligibility notices. As such, this argument is unavailing. Further, in response, Pennell argues that the Sheriff interfered with her rights by not timely notifying her of her rights under the FMLA. Doc. 57 at 15. The parties agree that Adam suffered from a "serious health condition" and that Calandros and Strafford understood that Adam would be in impatient care for some time. Pennell points to testimony that Strafford was aware that Pennell was providing comfort, love, and reassurance to Adam during his hospital stay. Nonetheless, despite these recognitions, the Sheriff did not provide Pennell with FMLA leave. Failure to follow the notice requirements of § 825.300 may constitute interference. Again, the Sheriff did not reply to these arguments, despite the opportunity to do so.[19]

As for prejudice, the Sheriff argues that Pennell has not alleged that she suffered prejudice as a result of a lack of notice and that the evidence demonstrates that she "received notice of (and eventually secured) leave to care for her husband following her first application in January 2017." Doc. 44 at 20–21. Pennell raises the same four grounds for prejudice that the Court discussed above. As discussed above, the records are sufficient to raise a genuine dispute of material fact. And she alleges in the complaint that Calandros told her that she did not qualify for FMLA leave while

---

[19] The Sheriff's response to Pennell's motion repeats these arguments. Doc. 55 at 12–14.

Adam was in the hospital, that she was placed on an unpaid leave of absence instead, and that she had negative 40 hours and paid time off when she returned to work. Because Pennell establishes a genuine dispute of material fact about prejudice, the Court will deny the Sheriff's motion.

Finally, as mentioned above, Pennell bases her FMLA claim upon: (1) her right to utilize the FMLA for her own serious health condition; and (2) her right to utilize the FMLA for her husband's serious health condition. The Sheriff highlights Pennell's testimony that this action is unrelated to her personal leave that she took before Adam's accident, including her FMLA applications in March of 2016 and September of 2016. Doc. 44 at 5 n.1. As such, the Court will grant the motion to the extent that Pennell bases her FMLA interference claim upon her right to use the FMLA for her own serious health condition.

In sum, the Court will grant the Sheriff's motion as to the FMLA interference claim only to the extent that Pennell bases that claim upon her right to use the FMLA for her own serious health condition. In all other respects, the Court will deny the motion as to the FMLA interference claim.

## ii. *FMLA Retaliation Claim (Count II)*

The Sheriff seeks summary judgment on Pennell's claim for FMLA retaliation. Doc. 44 at 21–27. Preliminarily, the Sheriff argues that Pennell's claim must proceed under the *McDonnell Douglas* burden-shifting framework because Pennell fails to offer any direct evidence of FMLA retaliation. Doc. 44 at 21. Where a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent,

courts apply the *McDonnell Douglas* burden-shifting framework. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). In response, Pennell does not dispute that she has failed to offer any direct evidence of FMLA retaliation. Instead, she cites caselaw pertaining to the necessary causal connection and a plaintiff's establishment of pretext (part of the *McDonnell Douglas* framework). Doc. 57 at 17–19. Therefore, the Court will utilize the *McDonnell Douglas* burden-shifting framework.

"[T]he FMLA protects the substantive rights it creates by prohibiting an employer from retaliating against its employee for engaging in activities protected under the Act." *Batson*, 897 F.3d at 1328 (citing 29 U.S.C. § 2515(a)(1)–(2)). "To establish a prima facie case of retaliation under [the FMLA], an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Id.* at 1329. "Once the employee has established a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action." *Id.* "If the employer does so, the burden shifts back to the employee" to demonstrate that the reason was pretextual. *Id.* "The employee may rely on evidence that he had already produced to establish his *prima facie* case." *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008).

In the complaint, Pennell alleges that Strafford provided her with a memorandum stating that she was approved for FMLA leave from December 12, 2016, to January 23, 2017. Doc. 17 ¶20. The parties agree that Pennell retroactively

received FMLA leave from December 12, 2016, to January 23, 2017. The only other mention in the complaint of FMLA leave arises from intermittent FMLA leave and block FMLA leave that Pennell received in or around September in 2016 for surgery. *Id.* at ¶13. Indeed, Pennell testified that she initially received intermittent FMLA leave for endometriosis-related issues in September of 2016, before undergoing surgery on or about October 4, 2016. Doc. 43-13 at 138:10–22, 141:21–23. She returned to work on October 24, 2016. *Id.* at 138:23–25, 139:1. However, Pennell testified that this action does not pertain to her personal leave before Adam's accident on October 29, 2016, her FMLA applications from March of 2016 and September of 2016 are not the subject of this action, and any workers' compensation or FMLA leave that she received before September of 2016 are not the subject of this action. *Id.* at 114:5–25. Further, the parties focus on the FMLA leave that Pennell requested, and later received, following Adam's accident. Doc. 44 at 24; Doc. 57 at 19. As such, the focus is on the FMLA leave that Pennell requested, and later received, following Adam's accident.

In her claim for FMLA retaliation, Pennell alleges that the Sheriff retaliated against her in violation of the FMLA, in that her request for FMLA leave and the utilization of that leave "was a substantial motivating factor that prompted [the Sheriff] to take several adverse employment actions against her, including" the following: (1) removing her from the tactical flight observer position; (2) denying her a pay raise following her annual performance review; (3) scheduling her to work on her day off; (4) suspending Adam; (5) denying her a transfer to the deputy sheriff pilot trainee position; (6) suspending Adam's worker's compensation benefits; (7) designating her

as TDY and requiring her to perform more work than her colleagues; (8) placing her under administrative inquiry; (9) denying her a day off to attend an event for trauma survivors; (10) denying her a day off on May 24, 2019; and (11) suspending her. Doc. 17 ¶49.[20]

Addressing each of these alleged adverse employment actions, the Sheriff offers two arguments: (1) Pennell cannot establish a causal connection between her FMLA leave and the Sheriff's employment decisions; and (2) even if Pennell could establish her *prima facie* case, her claim still fails because she cannot rebut the Sheriff's reasons as pretext. Doc. 44 at 22–27. Rather than distinguishing between the FMLA retaliation claim and the workers' compensation claim, Pennell addresses the claims together. Doc. 57 at 16–24. In attacking causation, the Sheriff argues what the unrebutted or undisputed evidence supposedly shows. *Id.* at 22–23, 25. For example, before diving into an analysis of each adverse action, the Sheriff argues that "the undisputed evidence shows that the decision makers had no knowledge of the protected activity." *Id.* at 23. The Sheriff also argues that Pennell lacks evidence that the Sheriff's

---

[20] Pennell's use of "substantial or motivating factor" is perplexing, as that language stems from First Amendment retaliation claims under 42 U.S.C. § 1983. *See Gattis v. Brice*, 136 F.3d 724, 726 (11th Cir. 1998) ("To succeed in a section 1983 suit based on a claim for retaliation of speech, the plaintiff must show that his speech was a 'substantial' or 'motivating' factor in the allegedly retaliatory decision."). Further, the Eleventh Circuit has declined to hold that the mixed-motive framework applies to FMLA retaliation claims. *Fonte v. Lee Mem'l Health Sys.*, No. 20-13240, 2021 WL 5368096, at *4 (11th Cir. Nov. 18, 2021) (stating that Supreme Court precedent forecloses the application of the mixed-motive framework to Title VII-retaliation claims and declining to apply the framework to FMLA retaliation claims). Given Pennell's other allegations, the Court construes this claim as a claim for retaliation under the FMLA.

legitimate, nonretaliatory reasons were pretextual. Of course, as explained below, articulating a legitimate, nonretaliatory reason for each adverse action is the second step of the framework. As shown below, many of the alleged adverse employment actions for this claim overlap with the alleged adverse employment actions for the workers' compensation retaliation claim. For purposes of this analysis, the Court analyzes the adverse actions listed in the FMLA retaliation claim.

1. Removing Pennell from TFO Position

The parties agree that Pennell was accepted into the tactical flight officer program in January of 2016. Robert Gray, chief pilot of the Aviation Unit, testified that Pennell was removed from the TFO supplemental assignment in February of 2017. Doc. 44-5 ¶¶3, 13.

The Sheriff focuses only on the causation element in attacking Pennell's *prima facie* case here. "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct and that the protected activity and the adverse actions were not wholly unrelated." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (internal quotation marks omitted). "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* (internal quotation marks omitted). Additionally, "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). "But

50

mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). "[T]emporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Jones*, 854 F.3d at 1272.

Gray testified that he removed Pennell from the program. *See* Doc. 44-12 at 68:6–11.  Pennell does not dispute this point. Doc. 57 at 19 ("[Pennell] was removed from her TFO position by Rob Gray.").[21] The Sheriff points to testimony from Gray for the proposition that "he had nothing to do with Pennell's FMLA leave." Doc. 44 at 23. Gray testified that the decision to remove Pennell from the program had nothing to do with Pennell's FMLA leave and that he did not even know the dates of her FMLA leave. Doc. 44-12 at 70:13–17. The Sheriff does not address temporal proximity.

In response to this causal attack, Pennell argues that Gray's comments suggest, "at a minimum," that Gray was aware that Pennell took time off for her husband's recovery. Doc. 57 at 19. In support, Pennell points to her own testimony that Gray told her in February of 2017 to turn in her gear because she "was more focused" on Adam's accident and that he needed her to be clear-headed. Doc. 44-13 at 301:8–14. Gray denies saying this comment, but knew that Adam had suffered a significant

---

[21] Gray also testified that he was only "part of making the decision" to remove Pennell. Doc. 44-12 at 36:1–7. Nonetheless, because the parties do not dispute that Gray decided to remove Pennell for purposes of this analysis, the Court will presume that Gray served as the decisionmaker.

injury. Doc. 44-12 at 36:8–25. Drawing all reasonable inferences in favor of Pennell, even if Gray told Pennell to turn in her gear because she "was more focused" on Adam's accident, that comment does not show that he was aware that she took FMLA leave because of Adam's accident. Nonetheless, Pennell also argues that she establishes causation through close temporal proximity. Doc. 57 at 19. The last day of Pennell's FMLA leave was January 23, 2017, and Gray removed her in February of 2017. At most, five weeks passed between these two dates. This five-week timeframe is sufficient to establish causation. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) ("We find this [seven-week] timeframe sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case."). As such, the burden shifts to the Sheriff to articulate a nondiscriminatory reason for the adverse action.

The Sheriff's burden of production is "exceedingly light." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)). In his motion, the Sheriff highlights that Gray describes maintaining proficiency with the equipment as "imperative and of utmost importance. Doc. 44-5 ¶7. According to Gray, a TFO must complete two flight missions per month "[a]t an absolute minimum" to maintain TFO status." *Id.* In articulating a nondiscriminatory reason, the Sheriff points to Gray's testimony that Pennell's removal "was entirely related to her lack of continued proficiency as a TFO and the fact that she had only completed two shifts in over a one-year period since initially being accepted into the program of January 2016." *Id.* at ¶13.

Because this nondiscriminatory reason satisfies the Sheriff's light burden, the burden shifts back to Pennell to demonstrate that the reason is pretextual.

To demonstrate pretext, an employee must show that the employer's proffered reason is false and that her FMLA leave was the real reason for the adverse action. *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1244 n.3 (11th Cir. 2010) (explaining, in the context of an FMLA retaliation claim, that even if the plaintiff successfully casted doubt on the defendant's nondiscriminatory rationale, she did not show that the rationale was pretext for discrimination); *Jones v. Aaron's, Inc.*, 748 F. App'x 907, 918 (11th Cir. 2018) ("To establish pretext, however, a plaintiff must show not only that the proffered reason is false, but also that the real reason was the plaintiff's FMLA leave."); *Leach v. State Farm Mut. Auto. Ins. Co.*, 431 F. App'x 771, 778 (11th Cir. 2011) ("We agree with the district court that Leach did not present sufficient evidence from which a jury could reasonably conclude that State Farm's stated reason was false and that the real reason was Leach's taking of FMLA leave."). "The plaintiff may do so by either directly 'persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Conner v. Lafarge N. Am., Inc.*, 343 F. App'x 537, 541 (11th Cir. 2009) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 1089, 1095 (1981)). "If the plaintiff fails to 'proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary

53

judgment.'" *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024–25 (11th Cir. 2000)).

Pennell relies upon the causal connection and Gray's testimony to demonstrate pretext. Although close temporal proximity between an adverse action and protected activity may serve as evidence of pretext, it is insufficient to establish pretext by itself. *Hurlbert*, 439 F.3d at 1298. Pennell does not argue that she was proficient or that she had completed more than two shifts following her acceptance to the program in January of 2016. Instead, she points to other portions of Gray's testimony. Pennell may establish pretext "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the Sheriff's] proffered legitimate reasons for [his] action that a reasonable factfinder could find them unworthy of credence." *Jones*, 854 F.3d at 1274 (internal quotation marks omitted). Gray testified that he asked her to turn in her equipment because she was "proving to be just very undependable. There was a lot of drama that seemed to always be going on." Doc. 44-12 at 34:15–17. Gray testified that "a lot of drama" accompanied Pennell, such as "*Oh, I have a migraine*, or, *I need to go home. I'm having female issues.*" *Id.* at 34:16–23 (emphasis in original). He explained that "[i]t was the totality of everything and that we weren't seeing effort and [Pennell] just [was] not a team player. There [were] a number of things that made us say, you know, let's terminate her Flight Officer status." *Id.* at 35:12–25. In one of his affidavits, taken before his deposition, Gray stated that Pennell was unreliable both before and after Adam's injury. Doc. 57-2 at 3. However, during his deposition, Gray conceded that he did not have any "concrete" evidence that she

was unreliable following her return after Adam's injury; he reiterated that he knew of her history of being unreliable and inability to support the function of being a flight officer. Doc. 44-12 at 55:22–25, 56:1–5.

Viewing the evidence in the light most favorable to Pennell and drawing all reasonable inferences in her favor, a reasonable jury could not find that the proffered reason for removing Pennell was pretext for Pennell taking FMLA leave. The testimony relied upon by Pennell highlights that Pennell was undependable, did not put forth the needed level of effort, was not a team player, and that she could not support the function of being a flight officer. This testimony is neither inconsistent with, nor contradictory of, Pennell lacking proficiency and failing to keep up with the program's expectations. Gray's testimony that "a lot of drama" accompanied Pennell, including his remark about her going home because of "female issues," relates to her undependability. At most, this testimony constitutes additional reasoning, not different reasoning, for her removal. *See Moore v. Jefferson Cnty. Dep't of Human Resources*, 277 F. App'x 857, 859 (11th Cir. 2008) (stating that evidence that an employer had additional reasons for terminating an employee does not prove pretext, whereas if an employer offers different reasons for terminating an employee, those reasons must be inconsistent to constitute evidence of pretext). Further, although Gray was unable to provide "concrete" evidence of Pennell's unreliability following her return after Adam's injury, he stated that Pennell had lacked continued proficiency and had completed only two shifts since January of 2016, which Pennell does not dispute. In sum, Pennell fails to demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the Sheriff's proffered reason that a reasonable factfinder could find the reason unworthy of credence. The Sheriff is entitled to summary judgment on this claim to the extent that Pennell bases this claim on her removal from the TFO program.

## 2. Denying Pennell a Raise

The parties agree that Garcia provided Pennell with her annual performance evaluation on July 17, 2017, and that Pennell did not receive a step-increase.

Despite arguing preliminarily that the "undisputed evidence shows that the decisionmakers had no knowledge of the protected activity," the Sheriff does not expressly identify the decisionmaker. Doc. 44 at 23. The performance report itself indicates that Garcia prepared it, Doc. 45-12 at 2, and Garcia testified that she completed it, Doc. 44-11 at 55:16–18. Nonetheless, the Sheriff skips straight to articulating a nondiscriminatory reason by pointing to Wojdyla's affidavit for the proposition that Pennell did not receive a raise because she had more than 96 unscheduled hours for the rating cycle. Doc. 44 at 23. Even assuming that Pennell can demonstrate her *prima facie* case, a reasonable jury could not find that the proffered reason for removing Pennell was pretext for Pennell taking FMLA leave.

As discussed above, Wojdyla testified that Pennell had accumulated a total of 1,291.50 unscheduled hours, but 1,186 of those hours were considered "protected" leave and would not count towards the calculation of the 96-hour disqualifier for her annual performance review for that ratings cycle. Doc. 44-3 at 3. She testified that these "protected" hours include all hours in which Pennell spent with Adam on an

approved, unpaid leave of absence while he was in the hospital. *Id.* She also explained that the protected hours included "all hours spent during that rating cycle, either on FMLA leave or worker's compensation." *Id.* After deducting the 1,186 "protected hours" from the 1,281.50 unscheduled hours, Pennell had 105.50 unscheduled hours remaining during the 2016-2017 rating cycle. *Id.* at 4. As such, Wojdyla testified that Pennell was not qualified under the General Orders to receive a step increase because the 105.5 unscheduled hours surpassed the 96-hour threshold. *Id.* She also explained that the calculation of 129 hours was a "simple mistake" by the Payroll Department at the time and that even with this mistake, Pennell still exceeded the 96-hour requirement. Thus, the Sheriff carries his burden to articulate a nondiscriminatory reason.

In response, Pennell argues that "the entire reason" why she did not receive the step increase was because the Sheriff's Human Resources, Benefits, and Payroll Departments "failed to count" her leave "properly as FMLA leave, resulting in her not receiving the raise." Doc. 57 at 20. But Pennell fails to demonstrate that the proffered reason is false and that her FMLA leave was the real reason. Indeed, as discussed above, Pennell conceded that she did not know whether some of the hours were related to the time that she had taken off to spend with Adam; she admitted that she would not be surprised if she was still over the hourly limit, even if the Sheriff backed out all leave time, because she had experienced medical issues that year; she admitted that she later learned that she exceeded the requirement because of the "time between June and [Adam's] accident"; and she testified that she later learned that the FMLA and

unscheduled time off had been backed out. Therefore, no reasonable jury could find that the proffered reason for removing Pennell was pretext for Pennell taking FMLA leave. As such, the Court will grant the Sheriff's motion to the extent that Pennell bases her FMLA retaliation claim upon the denial of a raise.

### 3. Scheduling Pennell to Work on Her Day Off

Pennell also alleges that "scheduling [her] to work on her day off" was an adverse action. Doc. 17 ¶49. The parties agree that Pennell filed a workers' compensation claim on December 8, 2017, after a narcotics test kit exploded in her face, injuring her eye. The parties also agree that Pennell sent a picture of a doctor's note to Garcia via text message on December 22, 2017, which indicated that she could return to work on December 25, 2017.

Although he argues generally at the outset of the relevant section of his motion that the undisputed evidence shows that the decisionmakers for all of the adverse actions lacked knowledge of the protected activity, the Sheriff's argument here is grounded in the nondiscriminatory reason for scheduling Pennell to work. The Sheriff construes this adverse action as referencing Pennell working on December 25, 2017, after she returned from workers' compensation leave for an eye injury. Doc. 44 at 24. Additionally, Pennell lists this adverse action for both this claim and the workers' compensation retaliation claim. In attacking the workers' compensation retaliation claim, the Sheriff argues that the actions are not materially adverse, adding, in relevant part, "[m]inor issues, such as having to work on a normal day off, would not deter a reasonable employee from making a claim." Doc. 44 at 28. Because this adverse action

58

is offered for both the FMLA retaliation claim and the workers' compensation retaliation claim, the Court will examine the Sheriff's materially-adverse-action argument.

Citing to the testimony from Garcia, whom he claims was the decisionmaker, the Sheriff argues that scheduling Pennell to work on December 25, 2017, was unrelated to Pennell's FMLA leave almost a year earlier. *Id.*[22] The Sheriff's motion highlights testimony from Garcia, in which she states that she did not know that Pennell was unavailable to work on December 22 until she received the text message from Pennell with a picture of the doctor's note on December 22. Doc. 44-11 at 85:12–18. As a result, Garcia's shift was four officers short—two other officers were out and another officer had called out sick—going into a holiday weekend. *Id.* at 85:19–22. To solve this dilemma, Garcia and a lieutenant from another platoon, Charlie Platoon, arranged for an officer from Charlie Platoon to work December 23 and December 24 to help Garcia with staffing. *Id.* at 85:19–25, 86:1. Because Pennell could return to work on December 25, she worked on December 25 and 26 to cover the shift of the deputy from Charlie Platoon who had helped Garcia's shift. *Id.* at 86:2–5. Garcia called Pennell to inform her. *Id.* at 84:18–21. Pennell was not previously scheduled to work on December 25 and 26. *Id.* at 86:12–14. Thus, the proffered reason is that

---

[22] Garcia testified that she did not decide to require Pennell to work, but was "part of that decision process." Doc. 44-11 at 86:17–25. She discussed the need to bring in Pennell with Floyd and Calandros just to ensure that she could do so, in light of the doctor's note. *Id.* Nonetheless, both parties identify Garcia as the decisionmaker for purposes of this analysis. Doc. 44 at 24; Doc. 57 at 20. As such, the Court treats Garcia as the decisionmaker.

Garcia's shift was understaffed and that Pennell covered the shift of the deputy from Charlie Platoon.

The Court begins with the Sheriff's attack on Pennell's *prima facie* case. The Court agrees that scheduling an employee to work on December 25, the first day on which the employee was cleared to return to work according to her doctor's note, does not constitute a materially adverse action. In the context of a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This standard is "decidedly more relaxed" than the standard for adverse employment actions applicable to discrimination cases. *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008). "*Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Id.* at 973 n.13.

The Eleventh Circuit has not yet decided in a published opinion whether the *Burlington* standard applies to FMLA retaliation claims. *Foshee v. Ascension Health-IS, Inc.*, 384 F. App'x 890, 891 (11th Cir. 2010) ("[W]e have not addressed whether the 'materially adverse effect' standard articulated in *Burlington Northern* should apply to claims of FMLA retaliation."); *but see Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015) (stating, in the context of an FMLA retaliation claim, that a plaintiff

must demonstrate that he suffered a materially adverse action). At least one court has applied the *Burlington* standard to an FMLA retaliation claim because other circuits have recognized the applicability of that standard to FMLA retaliation claims. *Rollins v. Banker Lopez & Gassler, PA*, No. 8:19-cv-2336-VMC-SPF, 2020 WL 4366083, at *14 (M.D. Fla. July 30, 2020). As such, the Court will apply the *Burlington* standard.

"The court does not doubt that in some contexts scheduling an employee for work during a holiday could amount to retaliation." *Reeves v. DSI Sec. Servs., Inc.*, No. 2:08-cv-602-WHA, 2009 WL 2738629, at *5 n.5 (M.D. Ala. Aug. 27, 2009), *aff'd*, 395 F. App'x 544 (11th Cir. 2010); *cf. Dixon v. Palm Beach Cnty. Parks & Recreation Dep't*, No. 07-80528-CIV, 2009 WL 200013, at *5 (S.D. Fla. Jan. 26, 2009) ("While it may be far from desirable to work on Sunday evenings, Defendant's denial of Plaintiff's request to have those days off does not constitute adverse employment action."), *aff'd*, 343 F. App'x 500 (11th Cir. 2009). But "[c]ontext matters." *Burlington*, 548 U.S. at 69. To that end, the Supreme Court explained that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* Here, although she was not initially scheduled to work on December 25 or December 26, the parties agree that she texted the doctor's note to Garcia on December 22, which indicated that she could return to work on December 25. In response, Pennell argues only that "a reasonable juror could determine that being scheduled to work on a day off, particularly when it is a holiday, could dissuade a reasonable worker from bringing a workers' compensation claim." Doc. 57 at 20. Thus, Pennell relies only upon the fact that

December 25 was a holiday to argue that this action is materially adverse. But context matters, and she does not highlight any contextual facts that render working on a holiday materially adverse. Further, Pennell responds to this adverse action only in relation to her workers' compensation claims, not her FMLA leave nearly two years earlier. Again, she argues that the adverse action could dissuade a reasonable worker from bringing a workers' compensation claim, not from pursuing FMLA leave. Similarly, in addressing causation, Pennell argues that "Garcia admitted that she was aware that [Pennell] was on leave due to her workplace injury." *Id.* at 20–21. And, in deposition testimony to which Pennell cites in her motion, she consistently testified that requiring her to work on December 25 and December 26 after sustaining her eye injury was retaliation for being out on workers' compensation leave. Doc. 44-13 at 280:1–3, 22–24, 284:18–24. Accordingly, the Court will grant the Sheriff's motion to the extent that Pennell bases her FMLA retaliation claim upon this action.

### 4. Suspending Adam

In her complaint, Pennell alleges that Adam informed Sergeant Jennifer Harris in or around April of 2018 that he was not feeling well and needed to go home for the afternoon. Doc. 17 ¶26. Adam allegedly told Harris that he was experiencing severe anxiety, had scheduled an appointment with his therapist, and needed some time. *Id.* According to Pennell, Garcia placed Adam on an emergency administrative suspension the next day. *Id.* Pennell alleges that "Garcia later commented that 'people with PTSD are fucked up and do not need to have guns'" when she was aware of [Adam's] PTSD symptoms." *Id.*

62

The Sheriff briefly addresses this adverse action. First, pointing to Pennell's testimony, the Sheriff argues that Pennell testified that this incident "has nothing to do with her lawsuit." Doc. 44 at 24. But the cited testimony shows only that Garcia's comment about people with PTSD not needing guns does not relate to this action. Doc. 44-13 at 424:7–25, 425:1–17. A search of Pennell's deposition testimony does not reveal support for this proposition, and the Sheriff has not pointed to any other evidence in the record that supports this proposition.[23]

But the Sheriff also cites to Pennell's allegations in the complaint to argue that the purpose of Adam's suspension was "to address mental health issues that he voluntarily came forward with to his chain-of-command." Doc. 44 at 24. The Court construes this attack as the Sheriff arguing that the record does not support Adam's suspension qualifying as an adverse action. Indeed, although Pennell identifies Adam's suspension as a basis for this claim in the complaint, she alleges that Garcia placed Adam on the emergency administrative suspension the day after he informed Harris that he was not feeling well, he needed to go home, he was experiencing severe anxiety, he had scheduled an appointment with his therapist, and he needed some time. Thus, as framed by Pennell in the complaint, Garcia placed Adam on the emergency administrative suspension after he informed his chain of command about his mental health issues. Pennell neither responds to the Sheriff's arguments, nor

---

[23] Garcia knew that Pennell had taken FMLA leave, as Strafford sent a memorandum to her on January 26, 2017, stating that Pennell had been approved to be on continual FMLA from December 12, 2016, through January 23, 2017, to care for a family member. Doc. 44-1 at 42.

comes forward with any evidence. As such, the Court will grant the Sheriff's motion to the extent that Pennell premises her claim on this adverse action.

5.   Denying Pennell a Transfer to the Pilot Trainee Program

The parties agree to the following facts about Pennell's application to the pilot trainee program in 2018: she applied to the pilot trainee program again on June 11, 2018; she testified that she was not critical about anything that occurred during the interview process during her second application for the pilot training position; she "had no issues" with Deputy Reveron, the candidate who was selected for the position; and Dustin Johnson was selected to replace Reveron.

The Sheriff only briefly addresses this alleged adverse action. Pennell does not respond to this argument. To the extent that the Sheriff argues that this action does not constitute a materially adverse action, that argument fails because denying a transfer to a desired position may well have dissuaded a reasonable employee from filing or supporting a request for FMLA leave. Relying upon Pennell's deposition testimony, he argues that Gray decided to deny the transfer to Pennell in June of 2018 and that his decision "had nothing to do with Pennell's request for FMLA a year-and-a-half prior." Doc. 44 at 24. Pennell testified that she understands why the Sheriff selected Reveron for the position and that she does not have any issues with the selection of Reveron. Doc. 44-13 at 305:11–21.

The "transfer" denial, as alleged in the complaint, also encompasses the Sheriff's subsequent selection of Dustin Johnson. Doc. 17 ¶27. Pennell testified that she had issues with the selection of Dustin Johnson. Doc. 44-13 at 306:2–13, 308:22–

64

25, 309:1–6. The Sheriff does not address this part of the "transfer" denial and relies upon only Pennell's testimony about the selection of Reveron.

Nonetheless, the Sheriff's motion is due to be granted because Pennell cannot establish pretext. In the discussion of the Title VII gender-discrimination claim, the Sheriff states that she was not selected for the pilot trainee program based upon lack of qualifications and better candidates. Doc. 44 at 30. In an affidavit from Gray, which the Sheriff provides, Gray states that the interviewers collectively determined that Pennell was not a good candidate when she applied in June of 2018: by that time, "she had been disciplined multiple times for performance issues and she was generally not performing her primary job well. Also, she still had only 200 hours of flying time, which by that time was very dated flying experience, and she only had experience flying fixed wing aircraft." Doc. 44-12 at 37.[24] As such, the burden shifts to Pennell.

But Pennell does not address pretext with respect to the denial of this position for her FMLA retaliation claim. Instead, she argues that this reason was pretext in the context of her Title VII gender-discrimination claim, such as by claiming that the Sheriff had never hired a female pilot. Doc. 57 at 26. Pennell fails to demonstrate that the Sheriff's proffered reason was false and that her FMLA leave from early-2017 was the real reason. Therefore, the Court will enter summary judgment for the Sheriff to the extent that Pennell bases her FMLA retaliation claim upon the denial of a transfer to the pilot trainee program.

---

[24] This citation utilizes CM/ECF page numbers.

6.  Suspending Adam's Workers' Compensation Benefits

In the complaint, Pennell alleges that she learned on September 17, 2018, that Adam's workers' compensation benefits were suspended. Doc. 17 ¶29. Pennell relies upon this alleged adverse action for both her FMLA retaliation claim and her workers' compensation retaliation claim.

The Sheriff briefly addresses this alleged adverse action. Again, Pennell does not respond. Citing to Pennell's testimony, the Sheriff argues that Pennell testified that Adam's loss of workers' compensation benefits "has nothing to do with this lawsuit." Doc. 24 at 24. But in the cited testimony, Pennell merely states that she does not believe that Adam's loss of benefits was related to her temporary-duty-assignment. Doc. 44-13 at 288:15–25, 289:1–7. However, a search of Pennell's deposition testimony reveals that Pennell agreed with the general statement that "workers' comp[ensation] is separate and apart from" the Polk County Sheriff's office. Doc. 44-13 at 287:14–16. Thus, she indicates that the Polk County Sheriff's office did not have any role in terminating Adam's workers' compensation benefits. Therefore, the Court will grant the Sheriff's motion to the extent that Pennell premises her claim upon this adverse action.

7.  Designating Pennell as TDY and Requiring Her to Work More

Pennell alleges that effective October 1, 2018, she was given a temporary duty assignment, referred to as "TDY," to the Northwest District General Crimes Unit. Doc. 17 ¶30. The parties agree that shortly after returning to work after filing a

66

workers' compensation claim for an injury that resulted from a fight with a suspect, Pennell was transferred to the General Crimes Unit as part of the Crime Suppression Team.

First, because Pennell offers this adverse action for both the FMLA retaliation claim and the workers' compensation retaliation claim, the Court analyzes the Sheriff's materially-adverse-action argument. Although Pennell conceded that the position was a "stepping stone," she testified that she did not want to be transferred to the General Crimes Unit. Doc. 44-13 at 314:10–22. A transfer to an entirely different department extends beyond "the most petty and trivial actions." *Crawford*, 529 F.3d at 973 n.13. Construed in the light most favorable to Pennell, a transfer to an entirely different department well may have dissuaded a reasonable worker from filing or supporting a request for FMLA leave. As such, Pennell establishes this element of her *prima facie* case.

In her response, Pennell also addresses "initiative nights" and argues that "a reasonable jury could determine" that working initiative nights was a materially adverse act. In her complaint, she alleges that although she was "expected to work a normal [d]etective schedule" upon her transfer to the General Crimes Unit, she "was also expected to work 'Initiative Nights' and was the only [d]etective required to adjust her hours to attend the initiatives. Doc. 17 ¶31. The Court construes Pennell's complaint of working initiative nights as "requiring [her] to perform more work than her colleagues," which is part of this adverse action. *Id.* at ¶¶49, 54. Thus, this adverse action consists of: (1) Pennell's designation as "TDY"; and (2) Pennell working

67

initiative nights. Pennell points to her own testimony that she was the only detective in the General Crimes Unit who was required to work initiative nights. Doc. 44-13 at 426:13–24. She testified that a sergeant told her that she needed to work initiative nights because she was assigned to the Crime Suppression Team, but another female detective who was assigned to the Crime Suppression Team was not required to work initiative nights. *Id.* at 427:2–10. Pennell also cites to Deputy Sheriff Samantha Skidmore's testimony, in which Skidmore testifies that Sergeant Jennifer Davis or Lieutenant Rebecca Barnes informed Pennell during a Tuesday meeting in front of Skidmore and others that Pennell would need to work every initiative night. Doc. 72 at 42:15–24. Detectives did not like working initiative nights, which was one day per week, because doing so prevented them from working on their assigned cases. *Id.* at 42:25, 43:1–2, 12–25, 4:1–9. Viewing the evidence in the light most favorable to Pennell and drawing all reasonable inferences in her favor, requiring only one employee out of several employees to work a particular night every week may dissuade that employee from filing or supporting a request for FMLA leave.

Focusing on the transfer, the Sheriff cites to Barnes's testimony to identify Captain Storie as the individual who decided to reassign Pennell to the General Crimes Unit. Doc. 44 at 24. Barnes testified that Storie informed him that Pennell "was coming to the unit" and to "train her as a detective and her TDY over." Doc. 44-7 at 42:9–14. The Sheriff argues that "[t]here is absolutely no evidence" that the transfer decision was connected to Pennell's FMLA leave in January of 2017. Doc. 44 at 24. Thus, the Sheriff seeks summary judgment by showing that the record lacks evidence

to support causation. *See Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

In response, Pennell argues that "a reasonable juror could certainly determine" that being transferred to an undesirable position "could dissuade a reasonable worker from bringing a workers' compensation claim." Doc. 57 at 22. As for causation, Pennell argues that the transfer occurred "[j]ust weeks after being injured in the line of duty and filing a claim for workers' compensation benefits." *Id.* at 21. She further claims that her chain of command "was likely aware of her injury and the transfer occurred withing [sic] close temporal proximity of her protected activity (workers' compensation claim)." *Id.* Thus, Pennell responds only to the Sheriff's arguments in the context of her workers' compensation retaliation claim; she fails to address this adverse action as it pertains to her FMLA retaliation claim. Pennell fails to establish that the relevant decisionmaker knew of her FMLA leave, and the parties do not dispute that the transfer occurred shortly after her October 2018 workers' compensation claim, almost two years after the last day of FMLA leave. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."). As such, the Court will enter summary judgment in the Sheriff's favor on the FMLA retaliation claim to the extent that Pennell premises the claim upon her TDY designation.

The Sheriff does not attack causation for the initiative nights in this FMLA retaliation argument. Doc. 44 at 24 (arguing that the record lacks evidence that "this decision" to transfer was connected to Pennell's FMLA leave). The Sheriff does not produce a nondiscriminatory reason for initiative nights, either. Notably, Pennell, addresses initiative nights in her response by focusing on her workers' compensation claims: she argues that she was required to work initiative nights only "after her work place injury," Doc. 57 at 22, and cites to testimony where, when asked to explain the "point" of her complaint about initiative nights, she testified that requiring her to work initiative nights "goes hand in hand with the workers' comp[ensation] retaliation from September, Doc. 44-13 at 427:11–17. The Sheriff does not reply to this argument, despite being afforded the opportunity to do so. As such, the Court will deny the Sheriff's motion on this claim to the extent that Pennell bases the claim upon working initiative nights.

### 8.  Placing Pennell under Administrative Inquiry

Pennell alleges that Barnes notified her on April 5, 2019, that she was being placed under an administrative inquiry for job competency. Doc. 17 ¶31. As alleged, Barnes advised that the inquiry resulted from Pennell's failure to follow up on cases in a timely manner and from Pennell turning in a report late. *Id.* Barnes allegedly stated that she "felt bad" for needing to conduct the inquiry. *Id.*

Because Pennell offers this adverse action for both the FMLA retaliation claim and the workers' compensation retaliation claim, the Court analyzes the Sheriff's materially-adverse-action argument. The Court disagrees that placing Pennell under

an administrative inquiry is not materially adverse; the initiation of an administrative inquiry may well have dissuaded a reasonable employee from filing or supporting a request for FMLA leave. Citing to Barnes's deposition testimony, the Sheriff argues that Barnes initiated the administrative inquiry in April of 2019, and that she lacked knowledge of Pennell's request for FMLA over two years earlier. Doc. 44 at 24. Thus, the Sheriff seeks to disprove causation by citing to Barnes's deposition testimony. The testimony upon which the Sheriff relies states only that Barnes did not serve in any decision-making capacity with respect to prior FMLA leave or workers' compensation injuries. Doc. 44-7 at 9:9–14. In citing to Barnes's testimony for the nondiscriminatory reason, Doc. 44 at 13, the Sheriff also points to other testimony, in which Barnes stated that her, Floyd, and Garcia initiated the inquiry, Doc. 44-7 at 12:13–25,13:1–9. The testimony highlighted by the Sheriff does not state that Barnes was unaware of Pennell's FMLA leave. And the evidence indicates that Garcia was aware of Pennell's FMLA leave.

Pennell discusses the administrative inquiry while addressing her suspension. Doc. 57 at 11, 23. She points to a notice of administrative inquiry/investigation from Barnes to Pennell, dated April 5, 2019, which stated: (1) Pennell did not appropriately conduct follow-up on a conveyance burglary trend to which she was assigned on February 6, 2019; (2) Pennell did not complete a report until March 18, 2019, despite being the evidence custodian as of February 28, 2019; and (3) although the importance of making personal contact with victims upon assignment of cases was conveyed to Pennell on March 5, 2019, it was discovered during the meeting on March 12, 2019,

that she had not contacted a victim for a case assigned on February 27, 2019. Doc. 57-8 at 1. Pennell also points to Barnes's testimony that her, Floyd, and Garcia decided to initiate an administrative inquiry. Doc. 57 at 11. Pennell argues that Floyd and Garcia, "who had issues with [Pennell] missing work for years," initiated the inquiry that led to her suspension. *Id.* at 23. Again, the evidence indicates that Garcia was aware of Pennell's FMLA leave.

Citing to Garcia's testimony, Pennell also argues that "Garcia does not remember what started the AI other than a delay in [Pennell] submitting reports." Doc. 57 at 11. But this testimony pertained to another administrative inquiry, as Garcia testified about a May 14, 2019 memorandum from her to Floyd, in which Garcia found that Pennell violated General Order 26.1.E.11.a (Competency, Job Knowledge, Proficiency) and General Order 26.1.E.11.c (Competency, Job Knowledge, Proficiency (Repeated Violations)) as a result of her failure to follow up on an investigation into a retail theft that occurred at a Dollar General store on April 8, 2019. Doc. 44-11 at 95:7–25; 44-11 at 68–69[25]; *see also* Doc. 57-9 at 3 (listing an administrative inquiry in May of 2019 and an administrative inquiry in April of 2019). Garcia testified that either her or Barnes initiated this second inquiry. Doc. 44-11 at 97:22–25. Thus, despite arguing that the unrebutted evidence shows that decisionmakers did not know about her FMLA leave, the Sheriff fails to point to evidence that, for the first inquiry,

---

[25] The latter citation utilizes CM/ECF page numbers.

Floyd did not know of Pennell's FMLA leave or, for the first and second inquiry, that Barnes did not know of her FMLA leave.

Regardless, even if Pennell can establish a *prima facie* case, she fails to demonstrate that the Sheriff's proffered reason is false and that her FMLA leave was the real reason for the administrative inquiries. For the first administrative inquiry, the Sheriff explains in his motion that Barnes wrote that follow-up was not appropriately conducted on a conveyance burglary trend to which Pennell was assigned. Doc. 44 at 13. And he cites Garcia's testimony about the second administrative inquiry that Pennell completed reports late and did not immediately contact a victim. *Id.* Thus, the Sheriff carries his burden, and the burden shifts to Pennell.

But Pennell does not directly address the proffered reasons. Instead, she claims that Floyd and Garcia "had issues" with Pennell missing work for years and that Pennell was not disciplined for any of the issues relating to following up or the timeliness of her reports before the initiation of the inquiries. In the testimony to which Pennell cites, Garcia stated that, as of April 23, 2019 (before Pennell's final report about the video), she would not have disciplined Pennell; Davis testified that she gave Pennell a verbal counseling for not retrieving the surveillance video fast enough; Davis testified that she did not issue a letter of guidance or letter of retraining for Pennell's investigation into the neighborhood crime trend; and Barnes testified nobody issued Pennell any sort of reprimand or letter of guidance or retraining at the point when they discovered that Pennell had not completed a report about the neighborhood crime

trend . Doc. 41-11 at 100:16–25; Doc. 44-9 at 51:1–7, 55:14–17; Doc. 44-7 at 21:20–25, 22:1–11.

Pennell does not show weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Sheriff's proffered reasons for the inquiries such that a reasonable factfinder could find them unworthy of credence. She fails to demonstrate that the Sheriff's proffered reasons were false and that her FMLA leave from early-2017 was the real reason for these inquiries in 2019. As such, the Court will enter summary judgment in favor of the Sheriff to the extent that Pennell bases her FMLA retaliation claim on this ground.

9.  Denying Pennell a Day Off to Attend an Event for Trauma Survivors

Pennell alleges that she notified Davis of her overtime hours in May of 2019 and asked if she could take "flex" time off on May 17, 2019, to attend a function for trauma survivors. Doc. 17 ¶32. Pennell alleges that she needed to ask Detective James Frankowski if he could cover her on-call shift on May 17, 2019, to which he agreed, because his "email went unanswered." *Id.* She also alleges that on May 13, 2019, Frankowski told her that Davis instructed him not to cover Pennell's on-call shift on May 17, 2019. *Id.* at ¶35. As alleged, Davis told Frankowski that Pennell had already received a week off. *Id.* Pennell lists "denying [her] a day off to attend an event for trauma survivors" in both her FMLA retaliation claim and her workers' compensation retaliation claims as an adverse action. *Id.* at ¶¶49, 54.

Because Pennell offers this adverse action for both the FMLA retaliation claim and the workers' compensation retaliation claim, the Court analyzes the materially-adverse-action argument. In responding to the Sheriff's motion, Pennell argues that she "was told that she could not trade on-call duty with her co-workers and then her supervisor behaved in an 'extreme' manner and told the entire department that no one could trade on-call days going forward" because of Pennell. Doc. 57 at 22. To be sure, Pennell testified that deputies could usually switch with each other and that Davis told Frankowski, who "would go around begging" to take on-call shifts because he was "buying a new boat and wanted the money to pay in cash," not to cover Pennell's call. Doc. 43-13 at 430:16–25, 431:5–10. Pennell also offers the testimony of Deputy Sheriff Samantha Skidmore, who stated that Davis ran up and down the hallways, stating that nobody was allowed to switch shifts with Pennell because Pennell did not cover her end of the switch, as Pennell had switched shifts with Frankowski and then been unable to cover because she was sick. Doc. 72 at 50:9–20, 51:5–25, 52:1–5. Skidmore thought this behavior was "extreme," but also stated that Pennell was not singled out. *Id.* at 51:19–24, 56:1–6.

Pennell argues that "[p]airing this [action] with the other adverse actions" that Pennell faced at GCU "could lead a reasonable jury to determine that this was an adverse action motivated by retaliation." *Id.* But even when considering context, neither denying Pennell a day off to attend an event nor prohibiting people from switching shifts with her constitutes a materially adverse action. *See Dixon v. Palm Beach Cnty. Parks & Recreation Dep't*, No. 07-80528-CIV, 2009 WL 200013, at *5 (S.D. Fla.

Jan. 26, 2009) (holding, in the context of a retaliation claim, that the employer's denial of the plaintiff's requests to have Sundays off did not constitute an adverse employment action), *aff'd*, 343 F. App'x 500 (11th Cir. 2009). Rather, these actions are the type of "trivial harms" that the Supreme Court has distinguished from material adversity. *Burlington*, 548 U.S. at 68. As such, Pennell fails to establish her *prima facie* case with respect to this adverse action.

Regardless, even if the Court found material adversity, Pennell fails to rebut the offered nondiscriminatory reason. In addition to arguing that the denial has no relation to Pennell's FMLA leave over two years earlier, the Sheriff offers a nondiscriminatory reason, stating that Davis did not approve the request because Pennell was out of leave and Davis needed Pennell to work her scheduled shift because she was behind. Doc. 44 at 24. In the cited deposition testimony of Davis, she explains that attending the event was simply something that Pennell "wanted to do rather than what she had agreed to do, which was her job assignment of being on call" for work. Doc. 44-9 at 89:4–8. Pennell does not argue that this reason is pretext. Even when considering the above testimony of Pennell and Skidmore, that testimony does not render the nondiscriminatory reason unworthy of credence. As such, the Court will enter summary judgment in favor of the Sheriff to the extent that Pennell premises the FMLA retaliation claim upon this adverse action.

### 10.  Denying Pennell a Day Off on May 24, 2019

Pennell alleges that she requested a day off on May 24, 2019, and Davis denied her request. Doc. 17 ¶38. Because Pennell offers this adverse action for both the FMLA

retaliation claim and the workers' compensation retaliation claim, the Court analyzes the Sheriff's materially-adverse-action argument. The Sheriff also argues that this adverse action was over two years after Pennell requested FMLA leave and has no relation to her protected activity. Doc. 44 at 24. Pennell does not respond to this argument. The Court agrees that this adverse action is not materially adverse, *see Dixon*, 2009 WL 200013, at *5, but instead constitutes a "trivial harm[]," *Burlington*, 548 U.S. at 68. Therefore, the Court will grant the Sheriff's motion to the extent that Pennell premises her FMLA retaliation claim upon this adverse action.

### 11. Suspending Pennell

Pennell alleges that Barnes notified her on May 17, 2019, that her investigation was sustained and that Pennell faced a suspension of up to 80 hours. Doc. 17 ¶36. As alleged, Garcia informed Pennell on May 20, 2019, that Pennell would be transferred back to patrol effective May 22, 2019, and that this transfer went "hand in hand" with her suspension. *Id.* at ¶38. Pennell was informed on May 30, 2019, that she was suspended for 40 hours and that she needed to complete four online courses. *Id.* at ¶39.

Because Pennell offers this adverse action for both the FMLA retaliation claim and the workers' compensation retaliation claim, the Court analyzes the materially-adverse-action argument.  The Sheriff argues that Pennell received the suspension as a result of conduct that occurred during her assignment to the General Crimes Unit. Doc. 44 at 25. The Sheriff also argues that "[t]here is no evidence that this suspension, over two years later, was at all related to Pennell's application for FMLA." *Id.* Thus,

the Sheriff seeks summary judgment by showing that the record lacks evidence to support causation. *See Celotex*, 477 U.S. at 325 .

The Court begins with the Sheriff's argument that this action is not materially adverse. Pennell argues in response that her suspension was the "culmination of adverse employment actions." Doc. 57 at 23. According to the suspension memorandum from Floyd to Pennell, Pennell was suspended for 40 hours without pay, she was required to complete four training courses, and she was transferred back to patrol. Doc. 44-14 at 25. "The loss of a salary for a period of months, weeks, or days is a 'materially adverse' action which 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Alvarez v. Royal Atl. Developers*, 610 F.3d 1253, 1268 (11th Cir. 2010) (quoting *Burlington*, 548 U.S. at 68). As such, because Pennell lost pay for 40 hours, the suspension constitutes a materially adverse action.

As for causation, Pennell focuses on the administrative inquiry that led to the suspension, rather than the suspension, arguing that Floyd and Garcia, "who had issues with [Pennell] missing work for years," initiated the administrative inquiry. Doc. 57 at 23. But, as alleged within the FMLA retaliation claim, this adverse action focuses on the suspension, not the administrative inquiry that led to the suspension. In testimony cited by Pennell in her response, in which Floyd reviewed the suspension memorandum, Floyd stated that he ultimately decided that Pennell should be suspended for 40 hours without pay and required her to take four training courses. Doc. 44-10 at 53:2–10. But Pennell does not cite to any evidence that Floyd knew at

the time of Pennell's suspension that she had previously received FMLA leave. Thus, Pennell fails to carry her burden, and the burden does not shift to the Sheriff to articulate a nondiscriminatory, legitimate reason.

Even if Pennell could establish her *prima facie* case, a reasonable jury could not find that the Sheriff's proffered reason was pretext. The May 20, 2019 suspension memorandum from Floyd to Pennell, which the Sheriff provides, explains that Pennell was suspended from duty for violating the following General Orders: General Order 26.1.E.11.a – Competency, Job Knowledge, Proficiency; and General Order 26.1.E.11.c – Competency, Job Knowledge, Proficiency (Repetitious Violations). Doc. 44-14 at 25. Thus, the Sheriff carries his light burden, and the burden shifts to Pennell.

Pennell argues that her suspension "was the culmination of adverse employment actions," and she attempts to undermine the reasons for the suspension by attacking the decision to suspend her, along with the "culmination of adverse actions" leading to her suspension. Doc. 23 at 23–24. For example, she argues that she fell behind on her work because she was transferred against her wishes, given a heavy case load, and singled out to work initiative nights. *Id.* at 23. She argues that Floyd had the discretion in imposing the severity of the suspension and chose the harshest penalty. *Id.* She claims that Garcia testified that the transfer was not part of the disciplinary process. *Id.* at 24. But when viewing the evidence in the light most favorable to Pennell, she does not demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Sheriff's proffered reason for

her suspension such that a reasonable factfinder could find them unworthy of credence. Many of these reasons appear to arise from Pennell's disagreement with the actions of the Sheriff. But the Eleventh Circuit has emphasized that federal courts do not sit as super-personnel departments that reexamine business decisions of employers. *Feise v. N. Broward Hosp. Dist.*, 683 F. App'x 746, 751 (11th Cir. 2017) (citing *Chapman*, 229 F.3d at 1030). Pennell fails to demonstrate that the Sheriff's proffered reason was false and that her FMLA leave from early-2017 was the real reason for her suspension in 2019. As such, the Court will enter summary judgment in favor of the Sheriff to the extent that Pennell bases her FMLA retaliation claim on her suspension.

In sum, the Court will grant the Sheriff's motion on the FMLA retaliation claim, to the extent that Pennell bases that claim upon any of the following actions: removing Pennell from the Tactical Flight Observer position, denying Pennell a pay raise following her annual performance review, scheduling Pennell to work on her day off, suspending Adam, denying Pennell a transfer to the deputy sheriff pilot trainee position, suspending Adam's workers' compensation benefits, designating Pennell as TDY, placing Pennell under administrative inquiry, denying Pennell a day off to attend an event for trauma survivors, denying Pennell a day off on May 24, 2019, or suspending Pennell.

### iii. Workers' Compensation Retaliation/Coercion (Count III)

The Court now turns to Pennell's claim for "workers' compensation retaliation/coercion." Doc. 17 at 12.

"Workers' compensation allows an employee who is injured in a work-related incident to receive payments for all reasonable medical care and lost wages resulting from that injury." *Ramji*, 992 F.3d at 1236. Under Florida law, "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim under the Workers' Compensation Law." Fla. Stat. § 440.205. This section "creates a cause of action for employees who are subject to retaliatory treatment by their employers for attempting to claim workers' compensation." *Bifulco v. Patient Bus. & Fin. Servs., Inc.*, 39 So. 3d 1255, 1257 (Fla. 2010). To that end, Pennell alleges that the Sheriff retaliated against her for her "valid claims for Workers' Compensation benefits and/or [her] attempt to exercise her rights" under the Workers' Compensation Law. Doc. 17 ¶54. Except for two adverse actions, Pennell offers the adverse actions in her FMLA retaliation claim for this claim.

A claim under § 440.205 has the same elements as employment retaliation claims under federal law. *See Hornfischer v. Manatee Cnty. Sheriff's Office*, 136 So. 3d 703, 706 (Fla. 2d DCA 2014) ("A claim under [§ 440.205] has three elements: (1) the employee engaged in statutorily protected activity; (2) an adverse employment action occurred; and (3) the adverse action and the employee's protected activity were causally related."). Claims under § 420.205 are subject to the *McDonnell Douglas* burden-shifting framework. *See Wood v. Calhoun Cnty.*, 626 F. App'x 954, 955 (11th Cir. 2015) (applying the *McDonnell Douglas* burden-shifting framework to a claim under § 440.205). The Sheriff applies the *McDonnell Douglas* burden-shifting framework in

81

moving for summary judgment on this claim. Doc. 44 at 28–29. Again, in responding to the Sheriff's arguments against the FMLA retaliation and workers' compensation retaliation claims collectively, Pennell does not dispute that she has failed to offer any direct evidence of retaliation, and she cites to caselaw pertaining to the necessary causal connection and a plaintiff's establishment of pretext. Thus, the Court will utilize the *McDonnell-Douglas* burden-shifting framework.

First, the Sheriff argues that Pennell's workers' compensation retaliation claim focuses on only two of her workers' compensation claims: (1) Pennell's workers' compensation claim in December of 2017 for an eye injury that she suffered when a narcotics test kit exploded in her face; and (2) Pennell's workers' compensation claim in October of 2018 for injuries that she sustained during a fight with a suspect. Doc. 44 at 27.

The Court agrees that these claims are the relevant claims. Pennell testified that her workers' compensation claims prior to September of 2016 are not part of this action. Doc. 44-13 at 114:13–25, 115:1–12. The parties identify four workers' compensation claims that Pennell filed after October of 2016. Doc. 44 at 11. In addition to the two claims discussed above, Pennell filed a claim in February of 2017 after she injured her knee by stepping in a hole, and she filed a claim in August of 2017 after she stepped in spilled gas. However, the complaint lacks allegations about these claims. On the other hand, the complaint includes allegations about Pennell's eye injury in December of 2017 and her injury "in the line of duty" in September of 2018. Doc. 17 ¶¶25, 28. In responding to the Sheriff's motion, Pennell does not point to any

other workers' compensation claims. The evidence reveals no dispute that December 24, 2017, was Pennell's last day of leave for the leave related to her eye injury, as she returned to work on December 25, 2017. Doc. 44-11 at 86:2–5; Doc. 44-13 at 278:18–25, 279:1–19. For the other claim, although the parties reference Pennell's filing of the claim under the heading "October 2018," that heading seems to reference Pennell's temporary duty assignment to the General Crimes Unit, as Pennell testified that the fight with the suspect occurred in September of 2018, that she received approximately two weeks off, she went back to work around mid-September, and the temporary duty assignment went into effect at the beginning of October. Doc. 44-13 at 313:8–16, 314:1–6. As such, the analysis centers on Pennell's workers' compensation claim in December of 2017 and her workers' compensation claim in late-2018.

Pointing to his argument for the FMLA retaliation claim, the Sheriff argues that all of the employment decisions were based upon legitimate, nonretaliatory reasons. Doc. 44 at 28. Here, the Sheriff also argues that "Pennell has absolutely no evidence that any of the decisions made were connected in any way to her workers' compensation claims." *Id.* Thus, he argues that the record lacks evidence linking the adverse actions to the workers' compensation claims. Finally, he argues that the adverse actions are not materially adverse. *Id.* As with the analysis for the FMLA retaliation claim, the Court analyzes each of the adverse actions in the workers' compensation retaliation claim.

1. <u>Scheduling Pennell to Work on Her Day Off</u>

The relevant facts for this adverse action are discussed in the analysis for the FMLA retaliation claim. In seeking summary judgment, the Sheriff argues that this action is not a materially adverse action, that Pennell lacks evidence that the decision was connected to her workers' compensation claims, and that the basis for the decision was legitimate and nonretaliatory.

As discussed above, although Pennell was not initially scheduled to work on December 25 or December 26, the parties agree that she texted the doctor's note to Garcia on December 22, which indicated that she could return to work on December 25. In response, Pennell argues only that "a reasonable juror could determine that being scheduled to work on a day off, particularly when it is a holiday, could dissuade a reasonable worker from bringing a workers' compensation claim." Doc. 57 at 20. Thus, Pennell relies only upon the fact that December 25 was a holiday to argue that this action is materially adverse. But context matters, and she does not highlight any contextual facts that render working on a holiday materially adverse. Therefore, the Court will grant the Sheriff's motion to the extent that Pennell bases her workers' compensation retaliation claim upon this action.

2. Suspending Adam

Here, the Sheriff argues that Pennell lacks evidence that this decision, which Pennell alleges to have occurred in April of 2018 and, therefore, before her workers' compensation claim in late-2018, is connected to that claim or her workers' compensation claim in December of 2017. Pennell does not respond to this attack, such as by highlighting knowledge of the decisionmaker or close temporal proximity.

84

Therefore, the Court will enter summary judgment in the Sheriff's favor to the extent that Pennell bases her workers' compensation retaliation claim upon this adverse action.

### 3. Denying Pennell a Transfer to Pilot Trainee Program

The Court determined above that denying Pennell a transfer to the pilot trainee program qualifies as a materially adverse action. The Sheriff now argues that Pennell lacks any evidence that this decision in 2018 is connected to her workers' compensation claim in December of 2017 or her workers' compensation claim in late-2018. Pennell does not respond to this argument. She does not point to evidence that Gray knew of her workers' compensation claims, one of which came after her June 11, 2018 application, or demonstrate very close temporal proximity. As such, the Court will enter summary judgment in the Sheriff's favor to the extent that Pennell bases her workers' compensation retaliation claim on this adverse action.

Further, as discussed in the FMLA retaliation claim, Pennell cannot establish pretext. Again, in the discussion of the Title VII gender-discrimination claim, the Sheriff states that she was not selected for the pilot trainee program based upon lack of qualifications and better candidates. Gray states that the interviewers collectively determined that Pennell was not a good candidate when she applied in June of 2018: by that time, she had been disciplined multiple times for performance issues and was generally not performing her primary job well; she still had only 200 hours of flying time, which by that time was very dated flying experience; and she only had experience flying fixed wing aircraft. As such, the burden shifts to Pennell.

85

Like the FMLA retaliation claim, Pennell does not address pretext with respect to the denial of this position for her workers' compensation retaliation claim. As such, Pennell fails to demonstrate that the Sheriff's proffered reason was false and that her workers' compensation claims were the real reason. Therefore, the Court will enter summary judgment for the Sheriff to the extent that Pennell bases her workers' compensation retaliation claim upon the denial of a transfer to the pilot trainee program.

4.  Suspending Adam's Workers' Compensation Benefits

Here, the Sheriff now argues that Pennell lacks evidence that this decision, which Pennell alleges to have occurred in September of 2018, is connected to her two workers' compensation claims.[26] Pennell does not respond to this argument. Therefore, the Court will enter summary judgment in the Sheriff's favor to the extent that Pennell premises her workers' compensation retaliation claim upon this adverse action.

5.  Designating Pennell as TDY and Requiring Her to Work More

Like the other adverse actions that Pennell lists in her workers' compensation retaliation claim, the Sheriff argues that Pennell lacks evidence that designating her as TDY and requiring her to work more was connected to her workers' compensation claims. Doc. 44 at 28. The Sheriff also argues that this action does not constitute a

---

[26] Also, the Court reiterates Pennell's agreement with the general statement that "workers' comp[ensation] is separate and apart from" the Polk County Sheriff's office. Doc. 44-13 at 287:14–16.

materially adverse action and that the decision was based upon legitimate, nonretaliatory reasons. *Id.*

As discussed above in the analysis for the FMLA retaliation claim, Pennell responds only in the context of her workers' compensation retaliation claim. Responding to the Sheriff's materially-adverse-action argument, Pennell argues that "a reasonable juror could certainly determine that being transferred to a position [that] was not desired could dissuade a reasonable worker from bringing a workers' compensation claim. Doc. 57 at 21–22. Although Pennell conceded that the position was a "stepping stone," she testified that she did not want to be transferred to the General Crimes Unit. Doc. 44-13 at 314:10–22. A transfer to an entirely different department extends beyond "the most petty and trivial actions." *Crawford*, 529 F.3d at 973 n.13. Construed in the light most favorable to Pennell, a transfer to an entirely different department well may have dissuaded a reasonable worker from filing or supporting a workers' compensation claim. As such, Pennell establishes this element of her *prima facie* case. Again, Pennell also addresses "initiative nights" and argues that "a reasonably jury could determine" that working initiative nights was a materially adverse act. Doc. 57 at 22. Viewing the evidence in the light most favorable to Pennell and drawing all reasonable inferences in her favor, requiring only one employee out of several employees to work a particular night every week may dissuade that employee from filing or supporting a request for workers' compensation.

For causation as to the transfer, Pennell argues that her chain of command was "likely aware" of her injury and the transfer "occurred withing [sic] the close temporal

proximity of her protected activity (workers' compensation claim)," as the transfer occurred "[j]ust weeks after" she was "injured in the line of duty." Doc. 57 at 21. Thus, Pennell focuses on her workers' compensation claim resulting from her fight with a suspect in late-2018. As explained above, the Sheriff identifies Captain Storie as the individual who decided to reassign Pennell to the General Crimes Unit. Again, Pennell fails to establish that the relevant decisionmaker knew of her workers' compensation claims. For her workers' compensation claim in December of 2017, Pennell fails to highlight any close temporal proximity. *See Higdon*, 393 F.3d at 1220. Thus, with respect to the workers' compensation claim in December of 2017, Pennell fails to carry her burden. However, as to her workers' compensation claim in late-2018, Pennell highlights close temporal proximity by arguing that she was transferred "[j]ust weeks" after her injury in the line of duty and filing the claim. Indeed, the parties agree that the transfer occurred shortly after Pennell returned to work. As explained above, Pennell testified that the fight occurred in September of 2018 and that the temporary duty assignment went into effect at the beginning of October, shortly after she returned to work around mid-September 2018. This close proximity—only a few weeks—is sufficient to establish the causation element of Pennell's *prima facie* case. *See Thomas*, 506 F.3d at 1364.

As such, the burden shifts to the Sheriff to articulate a nondiscriminatory reason for the transfer. The Sheriff's proffered reason is located earlier in his motion, when he discusses the transfer. The Sheriff relies upon Barnes's testimony. Doc. 44 at 11. Barnes, who supervises the General Crimes Unit in the Northwest District, testified

that based on her conversation with Storie, Storie transferred Pennell to provide her with training as a detective. Doc. 44-7 at 7:7–15, 42:2–14; Doc. 44-7 at 34.[27] She also explained that Pennell had recently sustained an injury from a fight with a suspect and "we were attempting to give her a break from a bad experience in law enforcement to adjust from that experience." Doc. 44-7 at 34. She testified that this was her understanding based on conversations with supervision. Doc. 44-7 at 42:20–22. She also stated that this was "commonly done with a deputy who has been in a difficult situation, such as a shooting or another traumatic experience," Doc. 44-7 at 34, and that she has seen officers moved to other departments, Doc. 44-7 at 43:3–13. The Sheriff also cites to the deposition testimony of Davis, who served as Pennell's direct-line supervisor in the General Crimes Unit, in which she states that she had constantly asked for more officers to staff the short-staffed Crime Suppression Team, that Storie informed her that Pennell would transfer to GCU, and that she did not inquire into the reason for the transfer. Doc. 44-9 at 29:15–25, 30:1–9,48:25, 49:1–4. Thus, the Sheriff satisfies his burden of production in articulating nondiscriminatory reasons for the transfer: the desire to provide Pennell with training as a detective, give her a break from a bad experience in the line of duty, and provide support to a short-staffed unit.

As such, the burden shifts to Pennell. Pennell argues that the transfer occurred outside the standard process, in close proximity to her workers' compensation leave, and that Pennell "was told by Lt. Barnes that she heard that the transfer was due to

---

[27] This second record citation utilizes CM/ECF page numbers and refers to Barnes's affidavit, which is attached as an exhibit to her deposition testimony.

[Pennell's] injury in the line of duty." Doc. 57 at 22. Thus, Pennell relies upon the "timing, comment, and deviation from procedures" to show pretext. *Id.*

To support the proposition that Barnes told Plaintiff that she heard that the transfer was due to Pennell's injury, Pennell cites to Barnes's testimony, in which Barnes testified that she told Pennell that she had heard that the transfer was related to "not the injury so much as just going through the incident that she went through." Doc. 44-7 at 39:1–7. She explained that her assumption was that Pennell "needed to take a minute from working in patrol and do something different and get . . . off the streets for just a little bit." *Id.* at 39:14–22. Even when viewing this evidence in the light most favorable to Pennell and drawing all reasonable inferences in her favor, this testimony is consistent with the nondiscriminatory reasons. Indeed, the testimony cited by the Sheriff indicates that one of the reasons for the transfer was to give Pennell a break from a bad experience in law enforcement.

As for Pennell's contention that the transfer deviated from standard process, to establish pretext based on a failure to follow internal procedures, a plaintiff must show that the employer's deviation from the policy occurred in a discriminatory manner. *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 829 (11th Cir. 2019). The parties dispute whether this procedure was in accordance with internal policies. As highlighted above, Barnes stated that these transfers were common when a deputy faced a traumatic situation. On the other hand, Pennell testified that cross-division transfers are uncommon without body-for-body swaps. Doc. 44-13 at 285:13–23. Skidmore testified that based on her experience, Pennell's transfer occurred outside

the normal process and individuals usually must interview to obtain a position in the General Crimes Unit. Doc. 72 at 72:19–25, 73:1–4. But even if this transfer occurred outside the normal process, Pennell has not shown that it occurred in a discriminatory manner. The only remaining basis for pretext is the close temporal proximity, but close temporal proximity, by itself, is insufficient by itself to establish pretext. *Hurlbert*, 439 F.3d at 1298. Therefore, Pennell fails to provide sufficient evidence to create a genuine issue of material fact as to whether the Sheriff's reasons are pretextual. Therefore, the Court will enter summary judgment in the Sheriff's favor to the extent that Pennell bases her workers' compensation retaliation claim upon her TDY designation.

Finally, Pennell fails to establish the causal element of her *prima facie* case with respect to initiative nights. Again, the Sheriff's attack here is distinct from the corresponding attack upon the FMLA retaliation claim; here, he does not tie the lack of record evidence supporting any connection to only the transfer decision. In response, Pennell argues only that upon her arrival, and after her workplace injury, she was singled out as the only person to work initiative nights. But none of her testimony establishes that the decisionmaker knew of her workers' compensation at the time or that the temporal proximity was "very close."[28] Therefore, Pennell fails to carry her burden, and the Court will enter summary judgment in the Sheriff's favor to

---

[28] As discussed above, Pennell testified that she returned to work in mid-September and that her transfer was effective at the beginning of October. Skidmore testified that Pennell was instructed to work initiative nights in the meeting "a short time" after her transfer. Doc. 72 at 42:8–14. But even viewing this vague testimony in the light most favorable to Pennell does not shed light on when the decision to require Pennell to work initiative nights occurred or establish that the decision was in "very close" proximity to the protected activity.

the extent that Pennell bases her workers' compensation retaliation claim upon working initiative nights.

### 6. Placing Pennell under Administrative Inquiry

In the analysis for the FMLA retaliation claim, the Court explained that the initiation of an administrative inquiry may well have dissuaded a reasonable employee from filing or supporting a request for FMLA leave. Similarly, initiation of an administrative inquiry may well have dissuaded a reasonable employee from filing or supporting a request for workers' compensation. In the FMLA retaliation claim, the Sheriff sought to disprove causation by citing to Barnes's testimony for the proposition that Barnes lacked knowledge of Pennell's request for FMLA leave. In citing to Barnes's testimony for the nondiscriminatory reason, the Sheriff also pointed to other testimony, in which Barnes stated that she, Floyd, and Garcia initiated the inquiry. Now, the Sheriff argues that Pennell lacks evidence that the administrative inquiry of April of 2019 was related to her workers' compensation claims in December of 2017 and late-2018. As highlighted above, Pennell discusses the administrative inquiry in the context of her suspension, mentions that Garcia or Floyd initiated an inquiry after learning about her performance concerns and highlights that she was not disciplined, nor was discipline recommended, prior to the initiation of an inquiry. But she fails to demonstrate that the administrative inquiries in the spring of 2019 and her workers' compensation claims in December of 2017 and late-2018 were causally related.

And even if Pennell can establish her *prima facie* case, she fails to demonstrate that the Sheriff's proffered reason is false and that her workers' compensation claims

were the real reason for the administrative inquiries. For the first administrative inquiry, the Sheriff explains in his motion that Barnes wrote that follow-up was not appropriately conducted on a conveyance burglary trend to which Pennell was assigned. Doc. 44 at 13. And he cites Garcia's testimony about the second administrative inquiry that Pennell completed reports late and did not immediately contact a victim. *Id.* Thus, the Sheriff carries his burden, and the burden shifts to Pennell.

Like the FMLA retaliation claim, Pennell neither shows weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Sheriff's proffered reasons for the inquiries such that a reasonable factfinder could find them unworthy of credence, nor does she demonstrate that the Sheriff's proffered reasons were false and that her workers' compensation claims were the real reason for these inquiries in 2019. As such, the Court will enter summary judgment in favor of the Sheriff to the extent that Pennell bases this claim on this ground.

7. <u>Denying Pennell a Day Off to Attend an Event for Trauma Survivors and Denying Pennell a Day Off on May 24, 2019</u>

As discussed in the analysis for the FMLA retaliation claim, these actions are not materially adverse. Additionally, the Sheriff now challenges causation, arguing that Pennell lacks evidence that these decision in May of 2019 are connected to Pennell's workers' compensation claims in December of 2017 and late-2018. Pennell does not respond to this attack. Doc. 44 at 28. As such, the Court will enter summary

judgment to the extent that Pennell bases her workers' compensation retaliation claim upon these adverse actions.

8.  Suspending Pennell

Similar to the FMLA retaliation claim, the Sheriff argues that the record lacks evidence that Pennell's suspension in May of 2019 was connected to her two workers' compensation claims in December of 2017 and late-2018. *Id.* In analyzing this adverse action for the FMLA retaliation claim, the Court explained that Pennell failed to carry her burden. Pennell offers the same response to the Sheriff's argument as her argument in response to the FMLA retaliation claim. Again, in testimony cited by Pennell, Floyd states that he ultimately decided that Pennell should receive the 40-hour suspension and be required to take four training courses. Pennell fails to cite to any evidence that Floyd knew of her workers' compensation claims at the time of her suspension. As such, Pennell fails to carry her burden, and the burden does not shift to the Sheriff to articulate a nondiscriminatory, legitimate reason.

Like the FMLA retaliation claim, even if Pennell could establish her *prima facie* case, a reasonable jury could not find that the Sheriff's proffered reason was pretext. Again, the May 20, 2019 suspension memorandum from Floyd to Pennell, which the Sheriff provides, explains that Pennell was suspended from duty for violating the following General Orders: General Order 26.1.E.11.a – Competency, Job Knowledge, Proficiency; and General Order 26.1.E.11.c – Competency, Job Knowledge, Proficiency (Repetitious Violations). Doc. 44-14 at 25. The Sheriff carries his light burden, and the burden shifts to Pennell. For the same reasons discussed in the FMLA

94

retaliation claim, Pennell fails to demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Sheriff's proffered reason for her suspension such that a reasonable factfinder could find them unworthy of credence. She fails to show that the Sheriff's proffered reason was false and that her workers' compensation claims served as the real reason for her suspension. As such, the Court will enter summary judgment in favor of the Sheriff to the extent that Pennell bases her workers' compensation retaliation claim upon her suspension.

The Court will grant summary judgment in the Sheriff's favor on this claim.

> iv.  *Title VII Sex-Discrimination Claim (Count IV) and Florida Civil Rights Act Sex-Discrimination claim (Count V)*

In Count IV, Pennell sues the Sheriff for sex discrimination under Title VII of the Civil Rights Act of 1964. She alleges, in relevant part, that the Sheriff engaged in unlawful employment practices and discriminated against her on account of her sex by denying her a promotion and suspending her. Doc. 17 ¶59. Similarly, Pennell sues the Sheriff for sex discrimination under the Florida Civil Rights Act, alleging that the Sheriff engaged in unlawful employment practices and discriminated against her on account of her sex by denying her a promotion and suspending her. *Id.* at ¶66. "The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). As such, the Court addresses these claims together.

In moving for summary judgment on these sex-discrimination claims, the Sheriff offers these arguments: (1) Pennell lacks direct evidence of discrimination that she could use to avoid the *McDonnell Douglas* burden-shifting framework; (2) to the extent that Pennell's claims relate to her first attempt to apply for the pilot trainee position in June of 2015, she failed to exhaust her administrative remedies; (3) under *McDonnell Douglas*, Pennell cannot meet her initial burden by demonstrating the existence of any comparators; and (4) even if Pennell could demonstrate her comparators, she cannot rebut the reason for not selecting her for the pilot trainee program. Doc. 44 at 30. These arguments highlight that although Pennell includes both the failure to promote her and her suspension as the adverse actions for the claims, the Sheriff focuses only on the failure to promote.

### 1. Lack of Direct Evidence

The Sheriff argues that Pennell cannot show any purported remarks that amount to explicit and direct evidence that she was not selected for the pilot trainee position because of her gender. Doc. 44 at 32. In response, Pennell concedes that she relies upon circumstantial evidence of discrimination. Doc. 57 at 25.

### 2. Exhaustion Argument

The Sheriff argues that to the extent that Pennell's claims relate to her first attempt to apply for the pilot trainee position in June of 2015, the claims are improper because she failed to exhaust her remedies for those claims at the EEOC or the Florida Commission on Human Relations. Doc. 44 at 29–30. The Sheriff argues that any alleged discrete acts of discrimination must have occurred on or after September 18,

2018—300 days before Pennell filed her EEOC charge on July 15, 2019—for the acts to be encompassed in Pennell's charge of discrimination. *Id.* at 29. The Sheriff contends that consideration of any conduct or statements made before September 18, 2018, is improper because those acts were not encompassed within Pennell's charge. *Id.* The Sheriff points out that Pennell has alleged that Gray stated in June of 2015 that "it was only a matter of time" before Pennell would become pregnant. *Id.* at 29 n.7. Although Gray denies the statement, Doc. 44-12 at 59:11–21, Pennell testified that Gray said something along those lines, Doc. 44-13 at 127:14–25, 128:1–6, 21–24.

Pennell concedes that "the 2015 promotional decision" is time-barred. Doc. 27 at 25. Thus, to the extent that Pennell premises the claims upon the 2015 promotion decision, the claims are time-barred. However, Pennell argues that a plaintiff may use prior acts as background evidence in support of a timely claim. *Id.* at 25–26. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). But the statute does not bar an employee from using prior acts as background evidence in support of a timely claim. *Id.* Thus, the Court will consider Gray's comment only as background evidence.

### 3. Lack of Comparators

The Sheriff argues that Pennell cannot point to any comparators that were similarly situated and treated more favorably than her during the pilot interview process. Doc. 44 at 33. Instead, according to the Sheriff, Pennell only broadly generalizes about being the only female in the applicant pool. *Id.* The Sheriff also

argues that Pennell contradicts herself by stating that she does not disagree that the selected officers were more qualified than her or that they had more aircraft or law enforcement experience. *Id.* The Sheriff contends that Pennell agrees that she does not know anything about the other applicants' disciplinary history and that she agrees that her lengthy disciplinary history could have been a factor as to why she was not selected for the pilot trainee position. *Id.* at 33–34.

Title VII provides that it is unlawful for an employer to discriminate against any individual because of that individual's sex. 42 U.S.C. § 2000e-2(a)(1). As established above, the parties agree that Pennell does not present any direct evidence of discrimination. As such, the Sheriff applies the *McDonnell Douglas* burden-shifting framework. Under this framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). Here, Pennell alleges, as one of the two bases for her sex-discrimination claims, that the Sheriff discriminated against her by failing to promote her.[29] Not surprisingly, the elements under a failure-to-promote theory of sex discrimination under Title VII are nearly identical to those set out above: a plaintiff

---

[29] Although framed as a "promotion," Pennell describes her application in the complaint as "request[ing] a transfer to be a Deputy Sheriff Pilot Trainee after the position was posted" by the Sheriff. Doc. 17 ¶27. The Sheriff does challenge Pennell's framing of the position in moving for summary judgment.

must prove: "(1) that she is a member of a protected minority; (2) that she was qualified and applied for a promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). The fourth prong of both tests requires the plaintiff to establish a comparator.

In addressing how "similarly situated" a plaintiff and her comparators must be, the Eleventh Circuit recently held that "a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1218. In *Lewis*, the Eleventh Circuit set forth guideposts for the similarly-situated analysis, including that a similarly situated comparator ordinarily will share "the plaintiff's employment or disciplinary history." *Id.* at 1227–28. Ultimately, "a valid comparison will turn not on formal labels, but rather on substantive likeness." *Id.* at 1228. To that end, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot be reasonably distinguished.'" *Id.* (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). This similarly-situated-in-all-material-respects analysis applies to "*all* discrimination claims pursued under *McDonnell Douglas*." *Id.* at 1226 n.11 (emphasis added). As such, district courts have applied this analysis in sex-discrimination cases based upon a failure to promote. *See, e.g.*, *Atashkhaneh v. Sam's E., Inc.*, No. 8:19-cv-2814-WFJ-AEP, 2021 WL 633508, at *5 (M.D. Fla. Feb. 18, 2021), *appeal dismissed*, No. 21-10884-A, 2021 WL 2525311 (11th

Cir. Apr. 12, 2021); *Weatherington v. Dothan City Bd. of Educ.*, No. 1:19-cv-414-RAH-SMD, 2020 WL 7699844, at *11 (M.D. Ala. Dec. 28, 2020).

In response to the Sheriff's comparator argument, Pennell argues that a failure-to-promote case like this one does not require comparators. Doc. 57 at 25. Pennell rationalizes that "[t]his is logical, as the male who was chose[n] for the promotion, in a real sense, is the comparator." *Id.* Pennell also argues that a plaintiff's failure to produce a comparator "does not necessarily doom the case" and that a "triable fact exists if the record presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Doc. 57 at 25 (internal quotation marks omitted). However, a "meaningful comparator analysis must be conducted at the *prima facie* stage of *McDonnell Douglas*'s burden-shifting framework." *Lewis*, 918 F.3d at 1218. As highlighted above, the similarly-situated-in-all-material-respects analysis applies to all discrimination claims. Thus, Pennell's assertion that the law does not require a comparator lacks merit. As for Pennell's mention of the convincing-mosaic standard, a plaintiff alleging intentional discrimination seeking to survive summary judgment may, as an alternative to presenting direct evidence or satisfying her burdens under the *McDonnell Douglas* burden-shifting framework, "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination . . . ." *Id.* at 1220 n.6. Although she mentions the convincing-mosaic standard in passing, Pennell cites to the standard for her *prima facie* case under *McDonnell Douglas* at the beginning of her argument and she also discusses her evidence of pretext, which is part of the *McDonnell Douglas* burden-shifting

100

framework. Doc. 57 at 25–27. Her argument is made in the context of that framework, and she does not offer any analysis under the "convincing mosaic" framework. As such, Pennell pursues relief for these sex-discrimination claims under the *McDonnell Douglas* burden-shifting framework, and she must demonstrate that she and her comparators were similarly situated.[30]

Having determined that Pennell must demonstrate that she and her comparators were similarly situated in all material respects as part of her *prima facie* case, the Court turns to Pennell's efforts to establish comparators. Pennell does not expressly argue that she was similarly situated in all material respects to any individual. Indeed, she argues that a comparator is not needed. At the same time, she points to "the male who was chose[n] for the promotion" as "the comparator." *Id.* at 25. The parties agree that Deputy Reveron was selected for the position and that Pennell testified that she had "no issues" with the selection of him for the position. The parties also agree that Dustin Johnson was selected to replace Reveron after Reveron was unsuccessful in the

---

[30] Similarly, Pennell argues that because of the significant evidence of pretext, "a reasonable jury could determine that the decision to pass over [her] for the Pilot Trainee position in late 2018 were [sic] motivated by her gender." Doc. 57 at 27. In the complaint, Pennell also alleges that the adverse employment actions in each sex-discrimination claim "were motivated by sex-based considerations." Doc. 17 ¶¶60, 67. The mixed-motive framework requires a court to determine "whether a plaintiff has offered evidence sufficient to convince a jury that (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (internal quotation marks and alterations omitted). *McDonnell Douglas* is inappropriate for examining mixed-motive claims on summary judgment. *Id.* Here, Pennell cites to the standard for her *prima facie* case under *McDonell Douglas*, frames her argument in the context of that framework, and discusses the "significant evidence of pretext." Further, she does not argue in response to the motion that she pursues a mixed-motive theory for these sex-discrimination claims.

position. And Major Chris Colson, whose testimony Pennell provides, stated that Kenneth Carver was later hired for another position. Doc. 74 at 13:14–24.

Pennell highlights her own testimony, in which she testified that she had more flight experience than Johnson, "about equal" law enforcement experience compared to him, and she had a degree in the "area." Doc. 44-13 at 306:4–20. As such, she "felt like" she was "more qualified" than Johnson. *Id.* at 306:17–18.[31]

Pennell also cites to Colson's testimony about Carver's qualifications and background, in which Colson testified that Carver, who had worked at the agency for a long time, served as a drone pilot in the Tech Services Unit. Doc. 74 at 17:15–25, 18:1–2. Carver flew with the Aviation Unit as a spotter. *Id.* Colson described him as a "model employee." *Id.* But, to the extent that Pennell seeks to rely upon Carver's selection for another position as a basis for these sex-discrimination claims, that effort fails, as she alleges no facts about Carver in her complaint, her testimony lacks any mention of Carver, and her response lacks any comparison of her qualifications to Carver's qualifications.

In arguing that Pennell can point to no comparators that were similarly situated, the Sheriff argues that Pennell has a lengthy disciplinary history and has agreed that she does not know anything about the other applicants' disciplinary history. As highlighted above, a similarly situated comparator to Pennell "will share [Pennell's]

---

[31] Pennell also cites to her testimony and Gray's testimony to argue that Johnson was still in his probation period because he had transferred from another agency, but neither source supports this proposition.

employment or disciplinary history." *Lewis*, 918 F.3d at 1228. Pennell and her comparator "must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* The Sheriff details Pennell's disciplinary history in his motion. Doc. 44 at 12–14. For example, in July of 2016, Pennell was suspended for 8 hours without pay when she failed to respond to a subpoena to attend court. Doc. 44-13 at 76:7–25, 77:25, 78:1–9, 22–25. In February of 2017, Pennell received a letter of guidance after Sergeant Davis found a plastic baggy with methamphetamine residue in the backseat of Pennell's patrol vehicle after Pennell transported an arrestee. *Id.* at 212:21–25, 213:1–15. In March of 2017, Garcia prepared a letter of reprimand for Pennell because Pennell did not properly search the suspect whom she arrested, which resulted in a delay in discovering evidence. Doc. 44-11 at 53:6–25, 54:1–11. Pennell accepted responsibility of this mistake. *Id.* at 54:12–16; Doc. 44-13 at 227:6–8. Similarly, in August of 2017, Pennell received a letter of retraining because she did not complete the requisite qualification training for her rifle. Doc. 44-13 at 232:6–20. In May of 2018, Pennell received a letter of reprimand because she lost her gas mask. *Id.* at 290:21–25, 292:1–25, 293:1–2. Pennell testified that she had no complaints about receiving that reprimand. *Id.* at 293:3–5.

Pennell conceded during her deposition that she does not know whether Johnson has received letters of guidance, reprimand, or retraining. *Id.* at 308:17–21. Pennell neither responds to the Sheriff's argument about her disciplinary record nor

argues that she and Johnson have comparable disciplinary records.[32] Thus, the Court cannot conclude that Johnson is "similarly situated in all material respects" to Pennell. As such, Pennell fails to establish her *prima facie* case for these sex-discrimination claims.

### 4. Pretext

Assuming, for argument's sake, that Pennell can establish her *prima facie* case, Pennell fails to demonstrate pretext. In his motion, the Sheriff states that she was not selected for the pilot trainee program based upon a lack of qualifications and better candidates. Doc. 44 at 30. Indeed, in one of Gray's affidavits, which the Sheriff provides, Gray states that the interviewers collectively determined that Pennell was not a good candidate when she applied in June of 2018: by that time, "she had been disciplined multiple times for performance issues and she was generally not performing her primary job well. Also, she still had only 200 hours of flying time, which by that

---

[32] In a separate section of her response, Pennell cites to the testimony of Garcia and Floyd for the proposition that letters of retraining and letters of reprimand "are meant to be more educational than formal punishment and formal discipline does not occur until an[] employee is suspended without pay." Doc. 57 at 12 n.15 (internal quotation marks omitted). General Order 26.1 lists letters of guidance, retraining, and reprimand as types of disciplinary action that fall under the "informal disciplinary action" category, which is separate from "formal disciplinary action," which includes actions like suspension. Doc. 57-11 at 1–2. Garcia testified that although letters of reprimand, guidance, and retraining are meant to be more educational than "formal punishment," General Order 26.1 delineates each action as punishment. Doc. 44-11 at 8:23. Similarly, Floyd testified that letters of guidance and letters of retraining are informal disciplinary actions and that a letter of reprimand is a "higher level than a guidance or a retraining" letter. Doc. 44-10 at 8:8–25, 9:1–8. Regardless of whether Pennell received informal disciplinary action or formal disciplinary action, she does not argue that her disciplinary record is comparable to Johnson's record.

time was very dated flying experience, and she only had experience flying fixed wing aircraft." Doc. 44-12 at 37.[33] As such, the burden shifts to Pennell.

Pennell points to the following evidence. Skidmore testified that the program had never employed a female pilot and Gray testified that the program had not employed a female pilot during his tenure, although he was unaware of whether the program had employed a female pilot before his tenure. Doc. 44-12 at 14:24–25, 15:1–3; Doc. 72 at 27:18–25, 28:1. According to Colson, Pennell was the only female applicant for the position in 2018. Doc. 74 at 14:8–10. Second, Pennell points to testimony from Colson, in which Colson testified that Floyd told Colson that he would not recommend Pennell for the position. Doc. 74 at 19:4–9. Pennell also argues that the Sheriff did not repost the position or reinterview for the position after removing Reveron but instead "appointed two gentlemen who were at best similarly qualified" to Pennell. Doc. 57 at 27.

Because Pennell testified that an inter-agency memorandum is circulated to all members when a job opens, Doc. 44-13 at 117:16–19, Pennell argues that the failure to repost or reinterview violated standard procedure, Doc. 57 at 27. Pennell also points to Gray's testimony that he asked her to turn in her equipment for the TFO position because, in part, drama accompanied Pennell, such as migraines and "having female issues." Doc. 57 at 27. Finally, Pennell argues that although Gray asserted that part of the reason for not hiring Pennell was because she was not performing well, Gray

---

[33] This citation utilizes CM/ECF page numbers.

conceded that he did not review her performance evaluations. *Id.* Indeed, Gray testified that he heard that Pennell was consistently committing errors, getting into trouble, and was "generally not performing the job of a deputy sheriff quite well," but he did not review her performance evaluations, Doc. 44-12 at 56:12–25, 57:1, 20–25, which indicated that Pennell met expectations or exceeded expectation in each category, Doc. 57-4 at 2–3.

Pennell cannot establish pretext. Pennell argues that these reasons demonstrate "that the decision to pass over [her] for the Pilot Trainee position in late 2018 were motivated by her gender." Doc. 57 at 27. But a reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169–70 (2009). Viewing all of the evidence in the light most favorable to Pennell and drawing all reasonable inferences in her favor, she fails to establish that the proffered reasons are false and that discrimination on the basis of her sex was the real reason. For example, Colson's testimony about his conversation with Floyd does not demonstrate that she was rejected on the basis of that conversation instead of proffered reasons or that the real reason was her sex. Similarly, although Pennell claims that the Sheriff failed to follow standard procedure, she does not sufficiently demonstrate that selecting "two gentlemen who were at best similarly qualified" without reposting the position or reinterviewing her occurred in a discriminatory manner. *Connelly*, 758 F.

App'x at 829.[34] Further, although Gray conceded that he did not review Pennell's evaluations, despite claiming that part of the reason for not hiring Pennell was because she generally was not performing her job well, this testimony goes towards only one of the proffered reasons. Again, Gray stated that Pennell had been disciplined multiple times for performance issues, she was generally not performing her job well, and she had only 200 hours of dated flying experience. Pennell does not demonstrate weakness, inconsistencies, contradictions, or incoherencies such that a reasonable factfinder could find the proffered reasons unworthy of credence.

Therefore, the Court will enter summary judgment in favor of the Sheriff on the sex-discrimination claims to the extent that Pennell bases these claims on the failure to promote. However, Pennell bases both sex-discrimination claims upon her suspension, too. The Sheriff does not address this adverse action in moving for summary judgment on the sex-discrimination claims, even though he seeks summary judgment on all of Pennell's claims. Doc. 44 at 35. Therefore, the Court will deny the Sheriff's motion to the extent that Pennell bases these claims upon her suspension.

> v. *ADA Discrimination Claim (Count VI) and Florida Civil Rights Act Disability/Handicap Discrimination Claim (Count VII)*

In Count VI, Pennell sues the Sheriff for discrimination under the ADA. Similarly, in Count VII, Pennell sues the Sheriff for "disability/handicap" discrimination under the FCRA. In both claims, she alleges that the Sheriff engaged

---

[34] Presumably, Pennell intends for Carver to serve as the second "similarly qualified" individual, but she does not offer any support for why Carver is "at best similarly qualified."

in unlawful employment practices and discriminated against her "on account of her known disability, and/or because [the Sheriff] regarded her as having a disability, and/or because of [her] record of having a disability" in violation of the ADA or the FCRA. Doc. 17 ¶¶76, 86. Specifically, Pennell alleges, the Sheriff suspended her. *Id.* Courts analyze disability-discrimination claims under the Florida Civil Rights Act under the same framework as ADA claims. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir. 2005). The parties address these claims and Pennell's association-discrimination claim under Count VIII together in their briefing. However, for the sake of clarity, the Court will address the disability-discrimination claims under Count VI and Count VII together before proceeding to the associational-discrimination claim under Count VIII.

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To survive the Sheriff's motion for summary judgment, Pennell must cite to evidence that would allow a reasonable jury to find that the Sheriff suspended her because of her disability. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021). Pennell may do this by offering either direct evidence of discrimination or circumstantial evidence of discrimination. *Id.* Pennell offers no direct evidence of disability discrimination here. As such, the analysis proceeds based upon circumstantial evidence. Because the analysis proceeds based upon circumstantial evidence, the

Court will utilize the familiar *McDonnell Douglas* burden-shifting framework. *Id.* at 1215.

Under the framework, Pennell must first establish a *prima facie* case of disability discrimination, which requires her to show that "she (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability." *Id.* at 1215–16. If Pennell fulfills the *prima facie* showing, the burden of production shifts to the Sheriff to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 1216. If the Sheriff satisfies that requirement, the burden shifts back to Pennell to show that the reasons are merely pretext for disability discrimination; ultimately, Pennell bears the burden of showing that discrimination was the reason for her dismissal. *Id.*

The Sheriff contends that he "disputes all three elements" of the disability-discrimination claims, but he focuses only on the disability and causation elements. Doc. 44 at 34. Regarding Pennell's disability, the Sheriff argues that Pennell never placed the Sheriff on notice of a personal disability or medical issues limiting a major life activity. *Id.* at 35. The Sheriff also argues that Pennell never sought an accommodation for an alleged disability. *Id.* In response, Pennell identifies two disabilities: (1) her endometriosis; and (2) her hypertension. Doc. 57 at 28. Pennell argues that a reasonable jury could determine that her endometriosis qualifies as a disability. Doc. 57 at 28.[35] The parties agree that Pennell claims that she has a disability

---

[35] The ADA defines "disability" as "mean[ing], with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

related to ongoing, personal female issues. As explained above, Pennell testified that she initially received intermittent FMLA leave for endometriosis-related issues in September of 2016, before undergoing surgery on approximately October 4, 2016 and returning to work on October 24, 2016. The parties agree that Pennell considers this condition a permanent disability because she has flare-ups that affect her day-to-day activities. Indeed, Pennell testified that the surgery helped, but did not fully resolve the issue; the condition can interfere with her job when flare-ups occur. Doc. 44-13 at 147:15–23. In the complaint, Pennell does not identify this condition or describe it as a disability. Instead, Pennell alleges only that she "began having medical issues and was treating with physicians" in or around August of 2016. Doc. 17 ¶12.

Pennell also argues that a reasonable jury could determine that her hypertension is a disability. Doc. 57 at 28. The parties agree that Pennell claims that she has a disability related to hypertension, for which she has received medication since April or May of 2018. Pennell testified that she suffers from sporadic hypertension, for which she consults with a cardiologist every six months. Doc. 176:12–22, 177:5–9; 433:12–16. Her blood pressure can suddenly spike to stroke levels for weeks at a time. *Id.* at 177:5–9. Pennell testified that her high blood pressure causes her migraines, blurred vision, and "affects [her] ability to be just a normal human being." *Id.* at 178:3–10. In April of 2018, Pennell was hospitalized for three days as a result of her hypertension. *Id.* at 178:11–25, 179:1–23. In May of 2019, Skidmore drove Pennell to the hospital

110

because Pennell said her heart rate was high. Doc. 44-9 at 41:2–24; Doc. 44-9 at 47;[36] Doc. 72:49:20–24.

The Court need not analyze whether Pennell can demonstrate that she suffered from a disability and that she was a qualified individual, as she fails to establish that the Sheriff discriminated against her because of either disability. The Sheriff argues that the record lacks evidence showing how Pennell's suspension and her alleged disabilities are related. Doc. 44 at 35. "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Payne v. Goodyear Tire & Rubber Co.*, 760 F. App'x 803, 809 (11th Cir. 2019) (internal quotation marks omitted). "Liability under the ADA requires the employer to have discriminated because of the employee's disability as the employer had *actual knowledge* of the alleged disability at the time it took adverse employment action." *Howard v. Steris Corp.*, 550 F. App'x 748, 751 (11th Cir. 2013) (emphasis in original). "The plaintiff must show that the employer was aware of, meaning had 'actual knowledge' of the disability and that the unfavorable employment decision was due to, or because of, the disability." *Lowber v. W.L. Halsey Grocery Co.*, No. CV-12-J-3429-NE, 2013 WL 3992504, at *4 (N.D. Ala. Aug. 5, 2013).

As discussed above, Floyd served as the individual who ultimately decided to suspend Pennell. Pennell fails to show that Floyd had actual knowledge of her

---

[36] This citation references CM/ECF page numbers.

111

endometriosis or her hypertension. Instead, Pennell vaguely argues that Garcia and Floyd were aware of Pennell's need for time off due to her disabilities. Doc. 57 at 29. This argument focuses on knowledge of Pennell's time off, rather than knowledge of her endometriosis or hypertension. Regardless, Pennell does not point to any evidence showing that Floyd actually knew that Pennell took time off as a result of her endometriosis or hypertension. Because Pennell fails to point to any evidence showing that Floyd actually knew that Pennell took time off as a result of her endometriosis or hypertension, entry of summary judgment is warranted on the disability-discrimination claims.

Assuming, for argument's sake, that Pennell can establish her *prima facie* case of disability discrimination, she fails to demonstrate pretext. In his motion, the Sheriff contends that Pennell was suspended "for violation of General Orders (competency, job knowledge, proficiency (repeated violations))." Doc. 44 at 13. Indeed, the May 20, 2019 suspension memorandum from Floyd to Pennell, which the Sheriff provides, explains that Pennell was suspended from duty for violating the following General Orders: General Order 26.1.E.11.a – Competency, Job Knowledge, Proficiency; and General Order 26.1.E.11.c – Competency, Job Knowledge, Proficiency (Repetitious Violations). Doc. 44-14 at 25. As such, the Sheriff carries his light burden, and the burden shifts to Pennell.

Pennell cannot show pretext. Pennell highlights that Garcia testified that Pennell "had a great many absences related to non-medical reasons," but she could not identify any of the "great many absences." Doc. 57 at 30. Indeed, Garcia testified

in an affidavit that a few of Pennell's absences "were for reasons protected by the Family Medical Leave Act and for workers' comp[ensation] injuries," but "she had a great many other absences that were not related to any valid medical excuse." Doc. 57-1 at 1. As an example, Garcia testified that Pennell asked to leave work early in August of 2016 and that she subsequently posted a photograph to Facebook of her and her husband at a concert. *Id.* However, Garcia was unable to identify any absences that were unrelated to Adam's injuries, her own use of FMLA, or work-related injuries. Doc. 44-11 at 111:23–25, 112:1–25, 113:1–19. But a reasonable factfinder would not find the Sheriff's proffered reason unworthy of credence as a result of this testimony. Pennell contends that her suspension resulted from other adverse actions that she suffered because she took leave for her endometriosis or hypertension or Adam's disabilities and vaguely relies upon "the pretext described" elsewhere in the response. Doc. 57 at 30. But even when viewing the evidence and "the pretext described" elsewhere in the light most favorable to Pennell and drawing all reasonable inferences in her favor, she fails to establish that the basis for the suspension is false *and* that discrimination on the basis of her endometriosis or hypertension was the real reason for her suspension. As such, Pennell fails to carry her burden.[37] Therefore, the

---

[37] Pennell also points to the "animus" towards her from Floyd and Garcia in passing and argues that "the trier of fact could reasonably determine that one of the motives behind [her] suspension were [sic] her disability . . . ." Doc. 57 at 30. Pennell does not dispute the Sheriff's reliance upon *McDonnell Douglas*. Indeed, Pennell argues that the existence of pretext, which is part of *McDonnell Douglas* framework, warrants denying the Sheriff's motion. Doc. 57 at 30. Pennell also does not argue in response to the motion that she relies upon a mixed-motive theory of discrimination for these disability-discrimination claims.

Court will enter summary judgment on the disability-discrimination claims in favor of the Sheriff.

### vi.   ADA – Association-Discrimination Claim (Count VIII)

In Count VIII, Pennell sues the Sheriff for association discrimination under the ADA. Pennell alleges that she is associated with Adam, who suffered from a disability, and that the Sheriff knew of Adam's disability and Pennell's relationship with him. Doc. 17 ¶94. She alleges that the Sheriff engaged in unlawful employment practices and discriminated against her because of her association with Adam's disability, in that the Sheriff suspended her from employment. *Id.* at ¶95. According to Pennell, the Sheriff, knowing that Adam needed Pennell at home on occasion, possessed an "unfounded perception" that Pennell would have to take substantial time way from work in the future to care for Adam. *Id.* at ¶97.

As explained above, under the ADA, an employer shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate against a qualified individual on the basis of disability" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association . . . ." *Id.* § 12112(b)(4). "A family relationship is the paradigmatic example

of a 'relationship' under the association provision of the ADA." *Hilburn v. Murata Elecs. N. Am., Inc.*, 17 F. Supp. 2d 1377, 1383 (N.D. Ga. 1998).

Pennell does not provide any direct evidence of discrimination for this claim. But Pennell may establish a *prima facie* case of association discrimination through circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). To establish a *prima facie* case of association discrimination under the ADA, Pennell must establish: (1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative or associate with a disability; and (4) that the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Id.* (internal quotation marks omitted); *Equal Emp't Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1319 (11th Cir. 2019). "If the plaintiff in an ADA 'association discrimination' case can establish these four elements, then the familiar *McDonnell Douglas* burden shifting is implemented." *Hilburn*, 17 F. Supp. 2d at 1383.

The Sheriff argues that Pennell never notified the Sheriff of medical issues limiting a major life activity. Doc. 44 at 35. The Sheriff also argues that the record lacks evidence that Pennell's marriage to, or association with, Adam "had anything to do with the suspension she received in May of 2019 for on-the-job violation of General Orders." Doc. 44 at 35. The record does not contain any evidence that Pennell's

marriage or association with Adam "had anything to do with" her suspension in May of 2019 for an on-the-job violation of General Orders. Doc. 44 at 35.

Pennell fails to identify Adam's disability under the ADA in her complaint. She alleges only that he sustained severe injuries as a result of his accident. Doc. 17 ¶15. In responding to the Sheriff's motion, Pennell fails to specify Adam's disability or point to evidence showing Adam's disability. Instead, Pennell argues that the Sheriff's argument demonstrates that he does not dispute that he suffered from "disabilities as a result of his tragic line of duty injury." Doc. 57 at 29. Pennell argues that Garcia and Floyd were aware of Pennell's need for time off due to her husband's disabilities. *Id.* Again, Floyd served as the individual who ultimately decided to suspend Pennell. Pennell fails to show that Floyd knew at that time—May of 2019, almost three years after the accident—that Adam had a disability under the ADA. Pennell again focuses on knowledge of Pennell's time off, rather than knowledge of Adam's disabilities. Regardless, Pennell does not point to any evidence showing that Floyd knew that Pennell took time off because Adam suffered a disability under the ADA. As such, Pennell fails to establish her *prima facie* case.

Assuming, for the sake of argument, that Pennell can establish her *prima facie* case, she fails to demonstrate pretext. Again, the Sheriff asserts that Pennell was suspended for violation of General Orders, and the May 20, 2019 suspension memorandum from Floyd indicates that violation of General Orders served as the basis for the suspension. As such, the burden shifts to Pennell. Pennell argues that her suspension was the culmination of adverse actions that occurred because she missed

116

work due to her disabilities or Adam's disabilities. Doc. 57 at 29–30. She highlights Garcia's inability to identify the "great many" absences. *Id.* And she references "the pretext described" elsewhere in the response. *Id.* However, when viewing the evidence in the light most favorable to Pennell and drawing all reasonable inferences in her favor, a reasonable fact finder could not find that the Sheriff's proffered reason is unworthy of credence. Pennell has failed to demonstrate that the basis for her suspension is false *and* that the real reason for her suspension was discrimination on the basis of Adam's disability.[38] Therefore, the Court will enter summary judgment in favor of the Sheriff on this claim.

## IV.    CONCLUSION

Accordingly, it is **ORDERED**:

1.    Plaintiff Christin Pennell's Motion for Partial Summary Judgment (Doc. 45) is **DENIED**.

2.    Defendant Grady Judd's Motion for Summary Judgment (Doc. 44) is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Defendant Grady Judd's Motion for Summary Judgment is **GRANTED**: as to Count I (FMLA Interference), to the extent that Pennell bases that claim upon her right to use the FMLA for her own

---

[38] As with the disability-discrimination claims, Pennell points to the "animus" towards her from Floyd and Garcia to argue that "the trier of fact could reasonably determine that one of the motives behind [her] suspension were [sic] her . . . husband's" disability. Doc. 57 at 30. Once again, she does not dispute the Sheriff's reliance upon *McDonnell Douglas*; she argues the existence of pretext, which is part of the *McDonnell Douglas* framework; and she does not argue in response to the motion that she relies upon a mixed-motive theory of discrimination in bringing this claim.

serious health condition; as to Count II (FMLA Retaliation), to the extent that Pennell bases that claim upon any of the following actions: removing Pennell from the Tactical Flight Observer position, denying Pennell a pay raise following her annual performance review, scheduling Pennell to work on her day off, suspending Adam, denying Pennell a transfer to the deputy sheriff pilot trainee position, suspending Adam's workers' compensation benefits, designating Pennell as TDY, placing Pennell under administrative inquiry, denying Pennell a day off to attend an event for trauma survivors, denying Pennell a day off on May 24, 2019, or suspending Pennell; as to Count III (Workers' Compensation Retaliation/Coercion); as to Count IV  (Title VII -  Sex Discrimination) to the extent that Pennell bases that claim upon denial of a promotion; as to Count V (Florida Civil Rights Act – Sex Discrimination) to the extent that Pennell bases that claim upon denial of a promotion; as to Count VI (Americans with Disabilities Act – Discrimination); as to Count VII (Florida Civil Rights Act – Disability/Handicap Discrimination); as to Count VIII (Americans with Disabilities Act – Associational Discrimination).   In all other respects Defendant Grady Judd's Motion for Summary Judgment is **DENIED.**

3.   A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count I (FMLA Interference) will be entered at the conclusion of this litigation, to the extent that Pennell bases that claim upon her right to use the FMLA for her own serious health condition.

4.      A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count II (FMLA Retaliation) will be entered at the conclusion of this litigation, to the extent that Pennell bases that claim upon any of the following actions: removing Pennell from the Tactical Flight Observer position, denying Pennell a pay raise following her annual performance review, scheduling Pennell to work on her day off, suspending Adam, denying Pennell a transfer to the deputy sheriff pilot trainee position, suspending Adam's workers' compensation benefits, designating Pennell as TDY, placing Pennell under administrative inquiry, denying Pennell a day off to attend an event for trauma survivors, denying Pennell a day off on May 24, 2019, or suspending Pennell.

5.      A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count III (Workers' Compensation Retaliation/Coercion) will be entered at the conclusion of this litigation.

6.      A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count IV (Title VII – Sex Discrimination) will be entered at the conclusion of this litigation, to the extent that Pennell bases that claim upon denial of a promotion.

7.      A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count V (Florida Civil Rights Act – Sex Discrimination) will be entered at the conclusion of this litigation, to the extent that Pennell bases that claim upon denial of a promotion.

119

8.    A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count VI (Americans with Disabilities Act - Discrimination) will be entered at the conclusion of this litigation.

9.    A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count VII (Florida Civil Rights Act – Disability/Handicap Discrimination) will be entered at the conclusion of this litigation.

10.    A judgment in favor of Defendant Grady Judd, in his official capacity as Polk County Sheriff, and against Plaintiff Christin Pennell, as to Count VIII (Americans with Disabilities Act – Associational Discrimination) will be entered at the conclusion of this litigation

11.    The Court will schedule, by separate notice, a telephonic status conference to schedule the remaining claims for trial.

**DONE AND ORDERED** in Tampa, Florida on August 12, 2022.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any